Jerry DIAZ and Cathy Diaz, Plaintiffs,

v.

JOHNSON MATTHEY, INC. and Johnson Matthey, PLC, Defendants.

Civ. No. 92–4717 (JEI).

United States District Court, D. New Jersey.

July 28, 1995.

---

Gross & Gross by Howard A. Gross, Alvin Gross, Cherry Hill, NJ, for plaintiffs.

Budd Larner Gross Rosenbaum Greenberg & Sade, P.C. by David J. Novack, Robert Greenbaum, Short Hills, NJ, for defendant Johnson Matthey, PLC.

## OPINION

IRENAS, District Judge:

From May of 1981 to October of 1990 the plaintiff, Jerry Diaz, worked as a maintenance mechanic in New Jersey for Johnson Matthey, Inc. ("JMI"), a corporation which, *inter alia,* refines, recovers, and markets platinum. Defendant, Johnson Matthey, PLC ("JM PLC"), is JMI's parent corporation. Plaintiff developed the platinum allergy from on-the-job exposure to platinum salts, and he seeks damages for ongoing lung problems. Diaz claims that employees of both JMI and JM PLC advised him that the effects of the platinum salt allergy were temporary and that he would have no further health problems related to the allergy when he stopped working for JMI and was no longer exposed to platinum salts.

On November 18, 1994, the Court rendered its decision on defendants' summary judgment motion. *Diaz v. Johnson Matthey, Inc.,* 869 F.Supp. 1155 (D.N.J.1994). In that opinion, Jerry and Cathy Diaz's claims against JMI were dismissed. The conspiracy claim against Johnson Matthey, PLC was also dismissed, but the fraud and negligence claims survived summary judgment. In its motion for summary judgment, JM PLC challenged the adequacy and admissibility of

the proposed testimony of plaintiff's expert, Dr. Donald Auerbach. Because the Court recognized that plaintiff needed expert testimony to maintain his claims for fraud and negligence, the Court granted defendant's application for a Fed.R.Evid. 104(a) hearing to decide whether plaintiff's expert testimony would be admissible.

At a *Daubert* [1] hearing spanning two and one-half days, plaintiff relied solely on the testimony of Dr. Auerbach, while JM PLC presented Mr. Philip Jones, Dr. Paul Epstein, and Dr. Robert Perin. In addition, the defendant submitted the depositions of Dr. John Brodsky and Dr. Alexander Higgins, and the plaintiff offered medical reports of Drs. Leonard Berkowitz and Eric Finkenstadt. At the conclusion of the hearing, the parties were allowed time to review the hearing transcripts, draft briefs and present oral argument.

The Court finds that plaintiff's expert is unqualified and that his testimony is unreliable, and, accordingly, the motion to strike Dr. Auerbach as a witness is granted. Without Dr. Auerbach's testimony, the plaintiff has no expert testimony on the issue of whether Diaz's exposure to platinum salts caused his chronic, post-employment asthma. Thus, Diaz cannot prove causation, and summary judgment in favor of JM PLC must be granted.

## I. THE PRECLUSIVE EFFECT OF THE WORKER'S COMPENSATION DECISION

■ Before we present our findings of fact and conclusions of law from the *Daubert* hearing, we address plaintiff's argument that because the worker's compensation court found that Jerry Diaz's respiratory injury was caused by his employment at JMI and is permanent, JM PLC is collaterally estopped from relitigating these issues. The doctrine of collateral estoppel (issue preclusion) may be invoked when

(1) the issue to be precluded is identical to the issue decided in a prior proceeding ...
(2) the issue was actually litigated in the

---

**1.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469

(1993).

prior proceeding ... (3) the court in the prior proceeding issued a final judgment on the merits ... (4) the determination of the issue was essential to the prior judgment ... and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*Matter of Estate of Dawson,* 136 N.J. 1, 20, 641 A.2d 1026 (1994) (internal quotations omitted).

■ The New Jersey Supreme Court has held that collateral estoppel would not apply here because worker's compensation and liability for negligence are "mutually exclusive remedies":

> the former affords what is essentially social insurance in the common and individual interest, irrespective of fault, [and] agreed exclusive relief for the consequences of an industrial accident arising out of and in the course of employment; the latter is the common-law mode of redressing personal injuries attributable to fault not within the Compensation Act.

*Imre v. Riegel Paper Corp.,* 24 N.J. 438, 450, 132 A.2d 505 (1957). In other words, the identity of subject matter necessary to invoke collateral estoppel is lacking. *Id.* Nor does the worker's compensation court, with its emphasis on a speedy and efficient resolution, offer the type of forum in which to resolve *Daubert* issues.

More significantly, the defendant in the earlier worker's compensation proceeding was JMI, not its parent, JM PLC, the remaining defendant in this case. Plaintiff cannot have it both ways. To bring this action outside the worker's compensation bar, plaintiff had to convince the Court that JM PLC and JMI were independent entities, *see Diaz,* 869 F.Supp. at 1163–64. Plaintiff cannot now argue the reverse and attempt to show the identity of JM PLC's and JMI's interests to invoke collateral estoppel. *Cf. Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 419 (3d Cir.) ("[J]udicial estoppel.... preclude[s] a party from assuming a position in a legal proceeding inconsistent with one previously asserted."), *cert. de-*

*nied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988).

## II. *DAUBERT* HEARING: FINDINGS OF FACT

### General

1. The refining of platinum creates chloroplatinate salts. Chloroplatinate salt is an allergic sensitizer. There is no dispute that a worker who becomes sensitized may suffer asthmatic symptoms while the exposure to these salts continues.

2. Jerry Diaz has asthma, a condition marked by shortness of breath and wheezing. Dr. Auerbach agrees with the statistic that about 15,000,000 Americans have asthma. Testimony was inconclusive as to what percentage of this total is represented by occupational asthma. One text estimates that in the United States, 2% of all asthmas are of occupational origin,[2] while Dr. Perin said some studies show that up to 20% of *adult* asthma is occupational.

3. Diaz was employed at JMI from May, 1981, through October, 1990. Diaz was exposed to chloroplatinate salts as a maintenance mechanic at JMI, but he has had no further exposure to this irritant since terminating his employment at JMI. While employed at JMI, Diaz became sensitized to chloroplatinate salts and suffered from asthmatic symptoms.

4. Diaz worked for Bethlehem Steel Corporation from 1977 to 1978 and for C.E. Glass Company from 1978–1981. From 1990 to the present he has worked for Allied Signal. Diaz was required to wear a mask and respirator while working at Bethlehem Steel and C.E. Glass, and there is some indication in the record that this may also be true at Allied Signal. This requirement would suggest at least the possibility of airborne irritants in all three workplaces.

### Dr. Donald Auerbach

5. Dr. Donald Auerbach is a pulmonologist or, in his words, a lung disease doctor. From 1973 to 1978, he was the Medical Di-

---

**2.** Stephen Lam & Moira Chan–Yeung, "Occupational Asthma: Natural History, Evaluation and Management" in *Occupational Medicine* 373 (Linda Rosenstock ed. April–June 1987).

rector of the Respiratory Therapy Department and the Pulmonary Function Laboratory at Cooper University Medical Center in Camden, New Jersey. Dr. Auerbach has a private practice in Cherry Hill, New Jersey.

6. Dr. Auerbach has treated patients that have asthma related to their work. He is not Board Certified in occupational medicine nor is he eligible to sit for the test for that certification. Diaz is the first patient that Dr. Auerbach has diagnosed with the platinum salt allergy.

7. Dr. Auerbach is not an expert in the field of epidemiology,[3] toxicology,[4] biostatistics, animal biology or industrial hygiene.

8. At the time Dr. Auerbach rendered his written expert report on March 8, 1994, he had read one article written by Dr. Stuart Brooks and other doctors: Stuart M. Brooks et al., "Cold Air Challenge and Platinum Skin Activity in Platinum Refinery Workers," *Chest* (June 1990) (the "1990 Brooks article").[5] Dr. Auerbach may have also read an unnamed book on occupational medicine that he had in his office. Prior to evaluating Diaz, Dr. Auerbach had read Stuart M. Brooks et al., "Reactive Airways Dysfunction Syndrome (RADS): Persistent Asthma Syndrome after High Level Irritant Exposures," *Chest* (Sept.1985), and he had heard Dr. Brooks lecture on RADS at a continuing medical education course in 1991.

9. Approximately three weeks before testifying, Dr. Auerbach, with the assistance of a medical librarian, ran a computer search at Cooper Hospital using the search words "platinum", "platinum asthma" and "platinosis." His testimony at the *Daubert* hearing relied on two articles from this search: Rolf Merget et al., "Nonspecific and Specific Bronchial Responsiveness in Occupational Asthma Caused by Platinum Salts after Allergen Avoidance," *Am. J. of Respiratory and Critical Care Medicine* (Oct. 1994) (the "1994 Merget article") and Mark T. O'Hollaren, "Asthma Due to Metals and Metal Salts," in *Occupational Asthma* (1992) (the "O'Hollaren article"). He also relied on general literature on occupational asthma, including Stephen Lam & Moira Chan–Yeung, "Occupational Asthma: Natural History, Evaluation and Management" in *Occupational Medicine* (Linda Rosenstock ed. April–June 1987) (the "Lam article") and Christian Allard et al., "Occupational Asthma Due to Various Agents: Absence of Clinical and Functional Improvement at an Interval of Four or More Years after Cessation of Exposure," *Chest* (Nov. 1989).[6]

10. Dr. Auerbach also "skimmed" the other articles that came up on the printout from his search, including Rolf Merget et al., "Quantitative Skin Prick and Bronchial Provocation Tests with Platinum Salt," *British J. of Industrial Medicine* (1991) (the "1991 Merget Article").[7]

11. Dr. Auerbach was not familiar with one of the first, if not the first, article published on the platinum allergy by Dr. A.

---

3. Epidemiology is the "study of the distribution and determinants of health-related states and events in populations and the application of this study to control health problems." Federal Judicial Center, *Reference Manual on Scientific Evidence* 174 (1994) [hereinafter Reference Manual].

4. "Toxicology is the science of the nature and effects of poisons, their detection, and the treatment of their effects." Reference Manual at 178.

5. This study was attached to one of Dr. Favata's reports, which was provided to Dr. Auerbach by the plaintiff's attorney. Dr. Auerbach had never read the article before receiving it from plaintiff's attorney. (Ex. 2 to Greenbaum Aff. at 28.) Dr. Brooks was also the co-author with Baker, Gann, Gallagher and Bernstein of "Cross–Sectional Study of Platinum Salts Sensitization Among Precious Metals Refinery Workers," 18 *Am. J. of Industrial Medicine* 653 (1990). However, Dr.

Auerbach did not indicate familiarity with this article.

6. This article is referred to during the hearing as the Malo article. Dr. Jean–Luc Malo is one of the authors along with Dr. Allard.

7. Plaintiff neglected to reveal to defendant Dr. Auerbach's intended reliance on the articles generated by his recent computer search, nor did he provide defendant with copies of the newly surfaced (but not newly written) articles prior to the hearing. It is hardly the hallmark of expertise to conduct a survey of medical literature just before testifying and to rely on articles up to then unknown or unread by the expert. It is a task that almost anyone with a bit of computer facility could easily perform. Dr. Auerbach's prior unfamiliarity with these articles is all the more surprising because of the limited amount of scientific literature dealing with platinum salt allergy.

Eaton Roberts called "Platinosis," 4 *A.M.A. Archives of Industrial Hygiene and Occupational Medicine* 549 (1951) or any other articles that found no long term health effects from the platinum allergy.

12. Plaintiff's attorney sent Diaz to Dr. Auerbach who took a medical and social history and examined him on February 16, 1994. Dr. Auerbach took Diaz's medical history in forty-five minutes or less. Plaintiff told Dr. Auerbach that he began having skin rashes, sneezing, and respiratory problems in 1982 and 1983. At first these symptoms would improve on the weekends when he was away from work. Eventually, however, the symptoms continued throughout the weekends, and by 1990 he was sneezing constantly and had shortness of breath and wheezing several times a week. Diaz reported these symptoms have persisted even though he left JMI in October of 1990. Diaz had a fifteen pack year history of smoking (a pack a day for fifteen years), but he quit smoking in 1989. When he saw Dr. Auerbach, Diaz was only using a Proventil inhaler on an as-needed basis. Past medication included Aerobid, Theo–Dur, a nasal spray, and Vanceril.[8]

13. Diaz also told Dr. Auerbach that in 1987 he was seen in the emergency room for asthma related to inhaling chlorine and that in 1989 his skin test for platinum became positive for the first time.

14. In 1989 Diaz was placed in a non-exposure area of the plant. When his problems continued, Diaz was sent to Dr. Perin, an allergist, who proscribed Theo–Dur and Aerobid. Dr. Auerbach did not know who proscribed Proventil for Diaz or the last time Diaz had used the Proventil prior to his February 16 exam.

15. Diaz said that he was not exposed to noxious inhalants at Allied Signal, but Dr. Auerbach made no effort to determine the actual employment conditions or the possible presence of allergenic workplace irritants at C.E. Glass, Bethlehem Steel or Allied Signal, Diaz's three other employers.

16. The only finding of note from Diaz's physical exam was that the lungs demonstrated mild wheezing on exhale. Diaz's chest x-ray, which had been taken on February 7, 1994, was normal, although Dr. Auerbach noted that the chest x-ray was of technically poor quality.

17. Dr. Auerbach's office performed a spirometry on Diaz. Spirometry is a PFT that measures the lungs' forced vital capacity ("FVC") and forced expiratory volume in one second ("FEV1"). FVC represents the volume of air which an individual can exhale from her lungs. FEV1 measures how much of this air is exhaled in the first second. FVC and FEV1 values are normally expressed in liters.[9] These two absolute values are used to derive three ratios which are expressed as percentages: (i) the ratio of the actual FVC value to the predicted value; (ii) the actual FEV1 value to the predicted value; and (iii) the ratio of the actual FVC to the actual FEV1. When Dr. Auerbach tested Diaz the absolute FVC value was 4.83 liters against a predicted of 5.91 liters, for a ratio of 82%; the absolute FEV1 value was 3.07 liters against a predicted of 4.74 liters, for a ratio of 65%; and the ratio of FEV1 to FVC (3.07/4.83) was 64%. According to Dr. Auerbach, a normal value for both the FVC ratio of actual to predicted and the FEV1 ratio of actual to predicted is 80% or above.[10] A normal value for the FEV1 to FVC ratio would be 75% or above.[11] *See* Ex. 2 to Greenbaum Aff. at 39–43.

18. At the direction of Dr. Auerbach the Delaware Valley Lung Center performed PFTs to determine plaintiff's total lung capacity, residual volume and diffusion capaci-

8. A Proventil inhaler relaxes the muscles around the bronchia to relieve shortness of breath. Theo–Dur is a long-acting drug for wheezing, and Aerobid is a steroid inhaler used to reduce inflammation of the bronchial tubes. Vanceril is also a steroid inhaler.

9. PFTs might vary by as much as 5% from day to day, according to Dr. Auerbach. Dr. Epstein said they might vary by as much as 10%.

10. Dr. Epstein considered 75% a minimum normal FEV1 ratio of actual to predicted values. Tr. May 2, 1995, at 197.

11. Eighty percent is recognized as normal by the American Medical Association. Drs. Auerbach, Epstein and Higgins all used 75% as the bottom of the normal range.

ty. Only Diaz's residual lung volume, the amount of air remaining in the lungs after exhaling, was abnormal.

19. Dr. Auerbach diagnosed Diaz as having occupational asthma, a type of obstructive lung disease, caused exclusively by prior exposure to platinum salts while working at JMI. He believed that Diaz did not have asthma prior to his employment at JMI. In his written report of March 8, 1994, Dr. Auerbach did not use the word permanent, but referred to the symptoms as persistent. During his direct testimony he concluded that Diaz's asthma was permanent. *See* Tr. May 1, 1995, at 109–10. However, during further examination Dr. Auerbach again characterized the condition as persistent.[12] Neither the 1994 Merget article nor the 1990 Brooks article relied upon by Dr. Auerbach found that the allergy was permanent.

20. Dr. Auerbach's report was based on (i) the February 16 exam and test results; (ii) several pulmonary function tests ("PFTs") dated from December 23, 1981 through July 23, 1990; (iii) two medical reports of Dr. Elissa Ann Favata; (iv) two medical reports of Dr. William Morowitz; (v) the medical reports from Allied Signal, Diaz's subsequent employer; and (vi) the medical literature referred to in ¶ 8, *supra.*

21. The factors Dr. Auerbach considered in coming to his diagnosis include: his belief (contradicted by other doctors) that there was no history of asthma prior to Diaz starting work at JMI; continued abnormality after he left JMI; the progressive increase in symptoms such as his rhinitis (runny nose), skin eruptions, and respiratory problems; the failure of his symptoms to abate when he was away from work as they did in the earlier years of employment at JMI; the abnormal PFTs coupled with the unremarkable chest x-ray indicating that there was no other causes for the condition; and selected samples of medical literature suggesting (contrary to the traditional view contained in the majority of such literature) that platinum salt allergy may cause persistent respiratory problems after exposure has ceased. Dr. Auerbach also believed it was valid to analogize platinum salt asthma to certain other types of occupational asthma that may continue even after exposure to the irritant is removed.[13]

22. Dr. Auerbach stated that he believed that Diaz "would have done better" if he had been removed from exposure immediately after his symptoms began in 1982–83. The 1990 Brooks article does not make any findings correlating the length of exposure after the onset of symptoms with the occurrence of symptoms after removal. The 1994 Merget article, which Dr. Auerbach utilized for his testimony, could not find such an association, although it noted that studies on other occupational asthmas have found a correlation. Dr. Auerbach said such a correlation makes common sense.

23. Dr. Auerbach did take into consideration Diaz's fifteen pack year smoking history, but he did not believe that Diaz had smoked enough to cause asthma. Furthermore, Dr. Auerbach testified that chronic obstructive pulmonary disease ("COPD"), caused overwhelmingly by smoking, is different from asthma. A PFT called a diffusion capacity test is normal or high with asthma, but low for COPD. Diaz's diffusion capacity test was normal. Additionally, Dr. Auerbach believed that Diaz was too young to have COPD.

---

12. This confusion also persisted during his deposition on April 26, 1995, when the following colloquy occurred:

Q. And would that be a permanent condition?
A. Asthma or its cousin, reactive airways disease syndrome, may be temporary or it may be permanent.
Q. Is it permanent or temporary in Mr. Diaz?
A. At the time I examined him he still had symptoms in pulmonary function abnormality, so that he has a persistent condition up until the time that I saw him, and I believe that this could be indefinite.

Q. Do you know that?
A. I think it's more likely than not that it would be permanent, but I couldn't say that—well, let me leave it at that.
Ex. 2 to Greenbaum Aff. at 24.

13. It is apparently not contested by the parties that, depending on the nature of the irritant, some occupational asthmas will disappear when the employee's exposure to the irritant ceases, while other irritants will cause an asthmatic condition that may persist even after the exposure stops.

24. Dr. Auerbach admitted that plaintiff's PFTs obtained on April 7, 1981, as part of his JMI pre-employment physical were abnormal. The FVC ratio of 72% was actually lower than the 82% reported in Dr. Auerbach's March 8, 1994 report. Dr. Auerbach did not have the pre-JMI employment test results before he wrote his report and had not even seen them until a week before trial.[14]

25. Between September 21 and 25, 1981, the National Institute of Occupational Safety and Health ("NIOSH") performed various medical tests on former and present employees at JMI, including Diaz, for the purpose of conducting a health hazard evaluation. After evaluating Diaz's test, the NIOSH doctors wrote Diaz that he may possibly have asthma and that he was allergic to certain aeroallergens, which are allergens[15] that are in the air such as dust, pollen, etc. Dr. Auerbach did not agree with the NIOSH diagnosis of asthma. He did not see the NIOSH test results prior to the hearing.

26. Dr. Auerbach had not seen the reports of Dr. Perin prior to rendering his March 8, 1994 report. Dr. Perin is an allergist who examined the plaintiff and, using skin prick testing, determined that he was allergic to aeroallergens. Dr. Auerbach said

that skin prick testing[16] for diagnosing pulmonary problems is overrated. He did not skin prick test Diaz to determine if he might be sensitive to chloroplatinate salts or to determine whether he might be sensitive to other allergens as suggested, not only by NIOSH, but by other examining physicians.

27. No one told Dr. Auerbach that Dr. Perin had diagnosed Diaz as being allergic to common household allergens, dogs and cats, etc. Dr. Auerbach's report did not consider whether Diaz was allergic to common household allergies. Dr. Auerbach was asked to assume that he had known about these allergies. Dr. Auerbach said that he would have considered this in making a diagnosis, and that if Diaz did have these allergies, it would indicate that Diaz had two problems: long term asthma and platinum salt asthma.

28. Dr. Auerbach believed Diaz's family history of emphysema (an aunt and a paternal grandmother had emphysema) would not affect his diagnosis because the history is too far removed. Dr. Auerbach was aware that Diaz "does have a son who has an allergic history, maybe asthma." Tr. May 1, 1995, at 141.

29. In a questionnaire filled out in December of 1981, about seven months after he started working at JMI, Diaz answered "yes"

---

14. During the hearing the following exchange occurred at the beginning of Dr. Auerbach's cross-examination:

> Q. The pulmonary function tests given to Mr. Diaz in this pre-employment physical for Johnson Matthey, when was the first time you saw that document?
> A. Last week.
> Q. Under what circumstances did you see it last week?
> A. I met with Mr. Gross, and we were going over certain aspects of this case.
> Q. Are you saying this was not considered part of your opinion back in 1994?
> A. That's correct.
> Q. Is it your testimony that a FVC of 72 percent of predicted is normal?
> A. No.
> Q. That's an abnormal test shown on this document, correct?
> A. Yes.
> Q. Is it your testimony that a 67 percent of predicted FEV-1 is a normal test result?
> A. No.
> Q. So that's another abnormal test that appears on this pulmonary function test?
> A. Yes.

> Q. And this is before Mr. Diaz ever worked at Johnson Matthey, is that correct?
> A. Yes.

Tr. May 1, 1995, at 142–43. It appears from the transcript that the parties are referring to Ex. 14 to the Affidavit of Robert J. Greenbaum, which is a report from Marion Laboratories dated April 7, 1981. (Ex. 16 is the same document). However, because this report refers to a 79 percent of predicted FEV1, rather than the 67 percent stated in the testimony, the court has based its fact finding on the document and assumed that the reference to "67 percent" is a typographical error in the transcript. Since Dr. Auerbach believed that 80 percent was the minimum normal value for the FEV1 ratio (see supra ¶ 17), he would have considered 79 percent an abnormal result.

15. An allergen is merely an allergic sensitizer.

16. Skin prick testing is one means of testing for allergies. The tester puts liquid on the patient's skin and then inserts a needle so that a small amount of the liquid enters the skin. An individual that is allergic to that liquid will develop a hive where the skin was pricked.

to each of the following inquiries: (i) "Do you usually cough first thing in the morning in the winter?"; (ii) "Do you usually cough during the day—or at night—in the winter?"; (iii) "Do you cough like this on most days for as much as three months each year?"; (iv) "Do you usually bring up any phlegm from your chest first thing in the morning in the winter?"; (v) "Do you bring up phlegm like this on most days for as much as three months each year?"; (vi) "Do you [ever experience] wheezing or whistling?"; (vii) "Have you ever had Bronchitis?"; and (viii) "Have you ever had hay fever?" When confronted with that document at the trial, Dr. Auerbach stated, "I haven't seen that before." Tr. May 1, 1995, at 219. He explained his conclusion that these findings had no bearing on his ultimate opinion by casting doubt on the accuracy of the answers given by Diaz.[17]

30. Dr. Auerbach did not believe Diaz's chlorine exposure would affect his diagnosis since chlorine rarely leads to persistent problems.

31. Dr. Auerbach said that Diaz's Allied Signal pre-employment PFTs were almost normal, but that his FEV1/FVC was an abnormal 66%. Diaz checked "no" on his Allied Signal pre-employment questionnaire [18] when asked whether he had asthma, wheezing or shortness of breath, although he checked "yes" for hay fever. Allied Signal tests from January, 1993, showed a decrease in plaintiff's pulmonary function since he began working at Allied Signal. A July, 1993, PFT was also abnormal.

32. Dr. Auerbach discredited the value of chest x-rays except for the diagnosis of acute respiratory problems such as acute emphysema. Page 318 of *Pulmonary Disease,* edited by Claude A. Frazier, M.D., suggests that chest x-rays may show evidence of platinum salt allergy.

33. Dr. Auerbach agreed with the statement: "Individuals with pre-existing asthma who develop asthma following exercise, exposure to cold air, or low levels of irritant fumes or dust at work are not generally accepted as having occupational asthma." Lam article, *see supra* ¶ 9.

34. Dr. Auerbach disagreed with the statement: "[W]ork related respiratory symptoms are not predictive of platinum salt asthma." 1991 Merget article, *see supra* ¶ 10.

35. Dr. Auerbach did not know all of the platinum salts to which Diaz was exposed nor whether all of the platinum salts to which Diaz was exposed caused asthma.

36. Dr. Auerbach stated that the grinding of solid platinum can contribute to the platinum salt allergy, although he admitted he never checked the medical literature to see if this conclusion was accurate. No medical literature identified in the record of this case suggests, or even discusses, such a causal link. *See infra* ¶ 59.

37. Dr. E. Glyn Hughes, former chief medical officer for JM PLC, prepared a videotape on the platinum salt allergy that was shown to JMI employees, including Diaz. Dr. Auerbach never reviewed the tape or the transcript of the videotape. Dr. Auerbach never reviewed any communications between JM PLC and JMI—about platinum salt or otherwise.

38. Dr. Auerbach said he could testify about the state of the knowledge of the platinum salt allergy on particular dates, but during the hearing he gave no opinion as to whether there was any change in the state of scientific knowledge concerning the platinum salt allergy during the period when Diaz was employed at JMI from 1981 to 1990.

---

**17.** Dr. Auerbach said:
> Well, first of all, I don't know that he had hay fever just because he answered that in a questionnaire.... I just say I mistrust those questionnaires a little bit, because people fill it out erroneously.

Tr. May 1, 1995, at 220. We note that as a new employee Diaz might have had more motivation to minimize his health problems rather than to maximize them. In any case, the cavalier dismissal of a patient's answers to eight specific questions is not convincing, particularly in light of the importance the medical profession places on getting complete health histories before treating or diagnosing a patient.

**18.** This questionnaire was signed by Diaz on October 11, 1990.

### Reports of Drs. Berkowitz and Finkenstadt

39. Plaintiff offered the written reports of Drs. Leonard Berkowitz and Eric Finkenstadt. In a May 13, 1991 report, Dr. Finkenstadt concludes that Diaz has chronic asthma that "may be related to occupational exposure from platinum; however, he does have other contributing factors, that being atophy [sic] [19] and sinusitis as well as his prior cigarette smoking." (Ex. 3 to Pl.'s Br.) Dr. Berkowitz, in a February 11, 1992 report, stated: "I would estimate that [Diaz] has a 5 percent disability relating to his airflow obstruction. Of that 5 percent, I believe that half is related to residual effects of the platinum salt allergy and the other half is related to his cigarette smoking and his aero-allergies which are not occupationally related." (Ex. 4 to Pl.'s Br.)

### Dr. Brooks' 1990 Article on Platinum Allergy

40. The 1990 Brooks article, *see supra* ¶ 8, was based on the 1981 NIOSH study. That study tested 29 terminated workers. The terminated workers had stopped working on average for five years, ranging from seven months to 107 months. Some of these workers had symptoms post-termination. From the article, one cannot determine which worker had which symptoms and the date that each worker had been terminated. Therefore, one cannot correlate a worker's current symptoms with either the duration of exposure or the passage of time after exposure ceases.

41. Although the 1990 Brooks article did find that some of the 29 workers no longer exposed to platinum salts demonstrated symptoms or conditions indicative of asthma, these symptoms were neither consistently predictable nor correlated to any factor (i.e., extent of exposure while working, length of time elapsed since cessation of exposure, smoking, age, other medical history, etc.):

> terminated workers ... reported asthma symptoms in 48 percent; showed evidence of airways obstruction in 18 percent; maintained a positive platinum salts prick skin test in 28 percent; had elevated IgE levels in 52 percent; and displayed a positive cold air challenge in 30 percent.

*Id.* at 1405.

42. The 1990 Brooks article never uses the word permanency.

Rather the authors concluded:

> [I]t has generally been concluded that asthma in terminated platinum refinery workers does not persist once work exposure has ceased. Our findings are contrary to this conclusion.... These findings suggest that allergic sensitization with asthma symptoms and the presence of nonspecific airway hyperresponsiveness in affected workers *may* continue for years after leaving the industry.

*Id.* (emphasis added). The article cautioned:

> The relative contributions and interactions of cigarette smoking, atopy, and allergic sensitization are important considerations. A recent study documents the strong association between platinum allergy and cigarette smoking.

*Id.* at 1406.

43. The June, 1982, NIOSH Interim Report # 2, the basis for the 1990 Brooks article, states on p. 7:

> It is possible that the increased prevalence of obstructive lung disease among terminated workers is related to their platinum salt sensitization; however, causation can not be determined in a cross-sectional study where earlier pulmonary function tests and skin tests results are not available. Smoking histories will be evaluated in the multifactorial analysis since smoking is a major cause of chronic obstructive lung disease.

Ex. 8 to Greenbaum Aff. The 1990 Brooks article was published nine years after the NIOSH study on which it was based, which Dr. Auerbach admits is unusual.

### Mr. Philip Jones

44. Mr. Jones has a masters degree in industrial hygiene and was JMI's Manager for Safety and Health from 1979 until 1985. He was responsible for evaluating the safety

---

19. Atopic means allergic.

risks of JMI employees and training employees in safety precautions.

45. In 1981, NIOSH contacted JMI in order to conduct a health hazard evaluation at their Winslow plant. Jones called NIOSH in 1983 or 1984 to ask when the final report from the 1981 health hazard study would be completed. A final report was not released as of Jones' departure in 1985.

46. Jones was the person at JMI who asked Dr. Hughes to make a presentation on platinum salt allergy which would be videotaped and shown to all current employees and then used to train new employees.

47. Dr. Hughes read the NIOSH interim report, which did say that there might be long term effects from the platinum allergy, but Jones never modified the videotape. Jones felt that Dr. Hughes did not believe the platinum allergy had long term effects. Jones had heard criticism regarding the NIOSH study, but he could not recall the details.

48. Jones stated that in 1981 JMI did some pre-employment screening, i.e., they did a general physical, they took a medical history, they tested for common allergies, and they performed PFTs. Someone who tested positive for common allergies would ordinarily not be hired by JMI. The PFTs were important to show whether an employee could use a respirator. In general, people with asthma would not be good hires because of potential problems with wearing a respirator.

### Dr. Paul Epstein

49. Dr. Paul Epstein is Chief of the Pulmonary Division of Graduate Hospital in Philadelphia, Pennsylvania. He is also a Clinical Professor of Medicine at the University of Pennsylvania. He has held several editorial positions, including Associate Editor for the Annals of Internal Medicine since 1978.

50. Dr. Epstein would order a new chest x-ray if the only one available was of poor quality. He would also be interested in an allergist's diagnosis, if one were available. Skin prick testing helps doctors understand what kinds of materials are irritating to the individual so that the patient can avoid exposure to that material. Avoiding exposure will often take care of the problem and prevent the need for medication.

51. Dr. Epstein said questionnaires worded in lay terms are typically used by pulmonary function physicians to help them learn the type of symptoms a patient has.

52. Dr. Epstein examined Diaz on October 22, 1993. During the exam, Dr. Epstein took Diaz's medical and occupational history, performed a "complete" physical, ran several PFTs, and took a chest x-ray. In addition to his exam, Dr. Epstein reviewed Dr. Auerbach's report; the NIOSH doctors' report; some JMI documents; Diaz's responses to a JMI questionnaire dated December 23, 1981; Dr. Perin's reports; and PFTs from April 7, 1981 through April 16, 1984.

53. Dr. Epstein's opinion, to a reasonable degree of medical certainty, was that prior to his employment at JMI, Diaz was already suffering from mild asthma, had allergies related to common aeroallergens and suffered some adverse effects from smoking. Dr. Epstein believed that Diaz's asthma was not related to work at JMI. This opinion is based on his PFTs prior to his employment at JMI;[20] his sensitivity to aeroallergens as determined by NIOSH a few months after beginning work at JMI; Dr. Epstein's determination that little had changed in Diaz's PFTs from September 22, 1981 through February 16, 1994;[21] and Diaz's answers to a JMI questionnaire on December 23, 1981.[22]

54. Dr. Epstein stated that smokers have decreased FEV1. Ordinarily when a patient has a cigarette-related abnormality, the patient will not show improvement with bronchodilator administration. Diaz showed a significant response to bronchodilation. Dr.

---

**20.** See supra ¶ 24.

**21.** Dr. Epstein remarked: "Other than [Diaz] getting better for a period of time during 1988 and '89, he really remained very stable through-

out the period from 9/22/81 through 2/16/94." Tr. May 2, 1995, at 181.

**22.** See supra ¶ 29.

Epstein believed that a portion of his decreased FEV1 was due to asthma and a portion due to smoking.

55. Dr. Epstein believed that Diaz became sensitive to platinum salts in 1989 when he skin-tested positive and that the welts he suffered before 1989 did not mean that Diaz was allergic to platinum salts.

56. Dr. Epstein was aware that certain occupational asthmas persist after exposure ceases. Dr. Epstein acknowledged that the 1990 Brooks article said that there continued to be decreased pulmonary function in platinum salt refinery workers after exposure to platinum salt had ceased, but he had a problem with any conclusion that this was due to platinum salt allergy since eight of nine of those terminated workers in the study were smokers.

57. Dr. Epstein was asked to assume that 100 workers with no history of asthma all started at JMI on the same day. When asked if there was a medically-accepted way to estimate when each would begin to experience asthma symptoms, Dr. Epstein said that the medical literature did not answer that question: no one has an estimate of how long it takes to develop the platinum allergy.

### Dr. Robert Perin

58. Dr. Robert Perin is an allergist who has been in private practice since 1981. Since the mid–1980s, JMI has referred to Dr. Perin employees who were having medical problems that JMI suspected to be related to exposure to platinum salts.

59. The sensitizer related to the platinum salt allergy is one of the salts that is refined from platinum, called sodium chloroplatinate. Dr. Perin had not heard of any literature which found that dust from grinding platinum metal causes the allergy.

60. Dr. John Sturgis is the plant physician for the West Deptford plant. Dr. Sturgis asked Dr. Perin to examine Diaz after he tested positive to platinum salts in a skin prick test given in 1989.

61. Dr. Perin first examined the plaintiff on May 4, 1989. Dr. Perin took a history, performed a physical, reviewed his past PFTs and performed additional PFTs, and referred Diaz for sinus and chest x-rays. The physical revealed nasal congestion and wheezing. The PFTs showed mild to moderate small airways obstruction. Dr. Perin concluded that Diaz had allergic rhinitis, asthma, and sinusitis. He put Diaz on medication, recommended that Diaz be placed in a non-exposure area and conducted further testing because he suspected Diaz was allergic to aeroallergens.

62. According to Dr. Perin, skin prick testing is the most sensitive technique to determine if someone has an allergy. Often if the allergen is removed, the symptoms complained of disappear—unless there is a permanent obstruction in the airways.

63. Dr. Perin again saw Diaz on May 18, 1989. The tests showed that Diaz was significantly sensitive to house mites, house dust, grasses, molds, and dog and cat. Because of the medications, Diaz had improved. Dr. Perin strongly discouraged Diaz from smoking. Dr. Perin said smoking made it almost impossible to determine what caused Diaz's problems as smoking can cause nonreversible bronchial hyperreactivity, a hallmark of asthma.

64. There are many things that can cause long term effects on someone's pulmonary condition including long term exposure to toxic fumes and a bout of walking pneumonia. Diaz's smoking history, his bronchitis as a teenager, and his collapsed lung as a newborn could have caused such long term effects. Dr. Perin noted that bronchitis is often misdiagnosed asthma.

65. Dr. Perin saw Diaz eight more times, on June 23, 1989; July 18, 1989; August 24, 1989; September 12, 1989; March 6, 1990; August 24, 1990; and March 4, 1991. After the July 18, 1989 visit, Dr. Perin noted that Diaz complained of problems while vacuuming and lawnmowing. He wrote to Dr. Sturgis saying that "[i]t would seem that we are dealing with conventional allergy at this time and I do not feel [Diaz's symptoms are] related to Platinum exposure." Ex. D–11.

66. After the August 24, 1989 visit, Dr. Perin believed Diaz's ongoing asthma was caused by exposure to a combination of pollen, dogs, and perhaps platinum salt.

67. After the August 24, 1990 visit, Dr. Perin noted that Diaz had "an increasing number of episodes of platinum hypersensitivity with progressively worsening symptoms from such exposure." Ex. D–15. Since JMI was unable to keep him completely free of exposure even in areas designated platinum-free, Dr. Perin recommended that Diaz be terminated from JMI.

68. Dr. Perin believes that the cumulative effect of exposure to an allergen may cause changes that are irreversible and that in general there is a correlation between extended exposure to an allergen and the long term effects of that exposure. Moreover, individuals may continue to have asthma after exposure to an allergen ceases. Whether the platinum salt allergy could be irreversible was still controversial although in general it was believed that, if you removed the patient from such exposure, the patient would be completely cured.

69. Dr. Perin stated that a person can become sensitized to platinum salts and have symptoms of asthma and allergies before the skin prick test for the platinum allergy is positive—although Dr. Perin noted that there were studies that showed otherwise.

70. According to Dr. Perin, welts on the skin are symptoms of the platinum allergy. If Diaz had welts back in 1983, it would be reasonable to assume that he had the allergy as far back as 1983.

71. A person who is allergic to one thing is likely to be allergic to many other things. This person is called atopic.

### Dr. John Brodsky

72. Dr. John Brodsky is a general practitioner. He conducts pre-employment medical screenings for Allied Signal. Dr. Brodsky first examined Diaz on October 11, 1990. After Diaz's physical, which included a PFT, Dr. Brodsky felt comfortable allowing the plaintiff to work at Allied Signal in a job that required the use of a respirator.

73. Between a PFT in October of 1990 and January of 1993, Diaz experienced a

"slight drop in the small airway obstruction from the percent predicted." Brodsky Dep. at 68. When asked what the cause of this shift might be, Dr. Brodsky stated: "Any shift might indicate either the results of past problems which were continuing or some current exposure to either allergens or respiratory irritants which might be causing a current problem. But it's impossible to be specific about which they were without additional specialized tests." Id. at 70.

74. Another PFT was taken in July, 1993, which also showed a slight decrease. After examining Diaz's records, Brodsky stated that Diaz "could have been described as asthmatic from his first examination." Id. at 77. More specifically, Diaz "has had moderate obstructive disease which has not changed much in three years." Id. at 73. According to Brodsky, chronic heavy smokers can be expected to have poor PFTs.

### Dr. Alexander Higgins

75. Dr. Higgins is certified in family practice. He saw Diaz on October 23, 1992; July 31, 1993; and in December, 1994.[23] Diaz first saw Dr. Higgins to renew his prescription for a Proventil inhaler. In July, 1993, he returned to Dr. Higgins because there had been a recent decline in his PFTs, and he was experiencing shortness of breath upon exertion. Diaz brought his PFTs for October 11, 1990; January 15, 1993; and July 15, 1993. They all showed moderate obstructive lung disease.

76. According to Dr. Higgins, asthma can lead to chronic obstructive pulmonary disease. Dr. Higgins also believes that different allergens will have different health impacts.

## III. CONCLUSIONS OF LAW

██ Rule 104(a) states in pertinent part: Preliminary questions concerning the qualifications of a person to be a witness, ... or the admissibility of evidence shall be determined by the court ...

---

**23.** The occurrence of the December, 1994 visit was stipulated to by the parties; it did not occur

before Dr. Higgins' deposition.

Plaintiffs must establish by a preponderance of the evidence that an expert is qualified and that the expert's testimony is admissible. *Daubert,* —— U.S. at —— n. 10, 113 S.Ct. at 2796 n. 10 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987)).

The defendant asserts that under the Supreme Court decision in *Daubert* and Judge Edward Becker's extended exegesis on *Daubert* in *In Re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717 (3d Cir.1994), *cert. denied sub nom. General Electric Co. v. Ingram,* —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995), plaintiff's expert testimony does not meet the requirements for admissibility. In *Daubert,* the Supreme Court held that the Federal Rules of Evidence, rather than the general acceptance test set forth in *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir. 1923), now governed the admissibility of expert testimony. These requirements are set forth in Fed.R.Evid. 702, 703, and 403.

Rule 702 reads:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

Rule 702 has three major requirements: the witness must be qualified to be an expert, the expert must testify to reliable scientific evidence, and the expert's testimony must assist the trier of fact. *See Paoli,* 35 F.3d at 741–43.

### A. *Rule 702—Qualifications*

■ Dr. Auerbach is a pulmonologist. Prior to evaluating Diaz, Dr. Auerbach had never treated a patient with the platinum allergy. While he treats patients who complain of asthma in association with their work, he is not Board Certified in occupational medicine. Prior to writing his report, Dr. Auerbach had only read one article discussing the long term effects of the platinum allergy, Dr. Brooks' 1990 article which had been furnished to him by the plaintiff's lawyer. He also may have read some general information on occupational asthma. Prior to testifying, he read two more recent papers on the platinum allergy and two papers on occupational asthma in general, and he skimmed several other articles on these subjects. *See supra* n. 7.

Dr. Auerbach knew little about the etiology of the platinum salt allergy. He believed that the dust from the grinding of platinum metal could cause this allergy, notwithstanding his inability to identify any medical or scientific support for this proposition. The parties, however, agree that exposure to chloroplatinate salts is the relevant allergen in the platinum salt allergy. These salts are created in the recovery and refining of platinum and "may be further refined to produce pure platinum." (Joint Final Pre–Trial Order ¶ 13.)

■ The qualifications requirement of Rule 702 has been interpreted liberally. *Paoli,* 35 F.3d at 741. Exclusion is improper simply because an expert does not have the most appropriate degree or training. *Id.* In *Paoli,* an internist who had "spent significant time reviewing the literature on PCBs" was allowed to testify as to whether PCBs caused illness in the plaintiffs. 35 F.3d at 754. Dr. Auerbach has only casually studied the literature on the platinum allergy; he certainly has not studied any papers that contradict his opinion that asthma stemming from the platinum salt allergy can be chronic. He was unable to testify as to the content of the single article he had read prior to writing his report without constantly referring to the article. Nor could he remember much about the material he had gathered a few weeks prior to testifying. Moreover, he admitted that several of the articles that he had retrieved were just skimmed. The expert in *Paoli,* on the other hand, "demonstrated significant familiarity with the literature on PCBs." *Id.*

Furthermore, the *Paoli* expert "had extremely broad experiences in the field of toxic substances [and had] written extensively in the field." *Id.* at 753. Dr. Auerbach by contrast has no other qualifications other than his medical education and his years practicing as a pulmonologist; he is neither an epidemiologist nor a toxicologist; he does not specialize in occupational medicine; and

he had never treated a patient, before Diaz, suffering from the platinum allergy.

In *Wade–Greaux v. Whitehall Labs., Inc.,* 874 F.Supp. 1441, 1465, 1476 (D.V.I.1994), *aff'd without op.,* 46 F.3d 1120 (3d Cir.1994), the court found a witness educated as a pediatrician, pharmacologist, and toxicologist unqualified to testify regarding the cause of birth defects because he had merely reviewed, for the purposes of litigation, selected literature on that subject. The facts surrounding Dr. Auerbach's "expertise" is similar—although Dr. Auerbach cannot claim he is a pharmacologist and a toxicologist as well as a physician.

Nor can the doctor be said to have made his diagnosis from significant experience with platinum salt asthma. Indeed, the plaintiff is the first patient Dr. Auerbach has ever diagnosed as having this allergy. *See O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1107 n. 19 (7th Cir.) (plaintiff's expert claimed plaintiff's cataracts were radiation-induced, but expert had treated only five cases of radiation-induced cataracts and was properly excluded), *cert. denied,* —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994).

Accordingly, the Court finds Dr. Auerbach unqualified to testify because he totally lacks experience in treating or diagnosing patients with platinum salt allergy and has at best a limited familiarity with the small amount of literature in the field which deals with the still contested issue of whether platinum salt allergy can cause long term health problems even after the patient is no longer exposed to chloroplatinate salts.

Normally, a ruling that a proffered expert is unqualified would end the inquiry. However, because the threshold for finding a proposed expert witness qualified is admittedly low, we will proceed to analyze the reliability requirement of Rule 702.

### B. *Rule 702—Reliability*

■■■ The inquiry into reliability requires a court to examine whether an expert has "good grounds" for his or her opinions. *Paoli,* 35 F.3d at 742 (quoting *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795). The Third Circuit requires district courts to examine all factors relevant to discovering whether particular scientific evidence is reliable, including those factors listed in *Daubert* and *Paoli* as well as any other inquiry that the district court finds is relevant. *Id.*

The *Daubert/Paoli* factors are: (i) whether the expert's hypothesis can be and has been tested; (ii) whether the method has been subject to peer review; (iii) the known or potential rate of error; (iv) the existence of standards controlling the technique's operation; (v) whether the testimony has been generally accepted in the scientific community; (vi) the relationship of the technique to methods which have been established to have been reliable; (vii) the qualifications of the expert witness; and (viii) the non-judicial uses to which the method has been put.

■■■ The focus of a *Daubert* hearing "must be solely on the principles and methodology, not on the conclusions that they generate." *Daubert,* —— U.S. at ——, 113 S.Ct. at 2797. In other words, the focus is "not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1316 (9th Cir.1995). "The evidentiary requirement of reliability is lower than the merits standard of correctness." *Paoli,* 35 F.3d at 744. A judge decides whether the experts are reliable; the jury decides whether the experts are correct. *Id.*

Dr. Auerbach's lack of qualifications, as discussed above in part III.A., is also relevant to the reliability analysis and is a factor tending to discredit reliability. His lack of in-depth knowledge of the medical literature relating to the platinum salt allergy, his lack of treating or diagnosing patients with this condition, his lack of training in epidemiology, toxicology and biostatistics, and his failure to gather all factual or medical information relating directly to Diaz all counsel that the Court be careful and cautious in considering the other factors bearing on the reliability of his opinion.

We found above that several findings influenced Dr. Auerbach's opinion: Diaz (he believed) had no history of asthma prior to working at JMI; Diaz's asthma continued after he left JMI; some of the medical litera-

ture read or skimmed by Dr. Auerbach had found that the platinum salt allergy can cause persistent post-exposure respiratory problems; it was valid (he believed) to analogize platinum salt asthma to other types of chronic occupational asthma. Dr. Auerbach also found it significant that Diaz's symptoms increased progressively. While at first his symptoms declined when he was away from work, eventually they persisted even when he was no longer directly exposed to platinum salts. Using the *Daubert/Paoli* factors, the Court must decide whether Dr. Auerbach's opinion is reliable.

■ As to general causation, i.e., whether the platinum salt allergy can cause continuing asthmatic symptoms after workplace exposure has ceased, it can be argued that this hypothesis has been tested, at least to a limited extent, by the Dr. Brooks article in *Chest,* the 1994 Merget article and the O'Hollaren article. *See supra* ¶¶ 8, 9.[24] However, Dr. Auerbach goes further than these articles when he offers the opinion that such condition is *permanent.* Thus, while Brooks, Merget and O'Hollaren can be said to have tested an hypothesis of *persistence* following cessation of exposure, it is less clear that their findings support a conclusion of permanence. Dr. Auerbach, whose overall familiarity with the medical literature relating to the platinum salt allergy can fairly be characterized as limited, did not even consider the possibility that symptoms might abate or ameliorate over time or what factors might predict or influence such improvement.

We have no testimony on whether Dr. Auerbach's opinion is generally accepted in the medical community, although we do know that the 1990 Brooks article noted at page 1405 that "it has generally been concluded that asthma in terminated refinery workers does not persist once work exposure has ceased." It does not appear that these three articles were based on studies conducted for the purposes of litigation, and based on their publication, these articles were subject to peer review.

That the status of the scientific literature supporting Dr. Auerbach's opinion is somewhat limited might not, in and of itself, be a bar to his testifying about general causation, provided he was qualified as an expert. *See supra* part III.A. However, Dr. Auerbach's lack of any general training or experience in epidemiology or toxicology, his lack of training or experience as an allergist, his lack of familiarity with all the medical literature dealing with the platinum allergy, and his lack of experience treating patients suffering from the platinum salt allergy all militate strongly against finding his opinions in this field reliable.

Indeed, dicta in *Downing,* 753 F.2d at 1240 n. 21 (cited in *Paoli,* 35 F.3d at 743), suggests that more than one expert may be needed to assess reliability. While we doubt that the Third Circuit will adopt an absolute rule that multiple experts are invariably needed to pass the Fed.R.Evid. 702 threshold of reliability, if we are to rely on only one expert, it must be one whose credentials, experience and knowledge far exceed those of Dr. Auerbach. Moreover, plaintiff offered no evidence at the hearing on the other *Daubert* factors: the degree of production of errors; the existence of standards controlling the technique's operation; and the relationship of the technique to methods which have been established to be reliable. Therefore we hold the plaintiff's evidence as to general causation is not reliable and must be excluded under Rule 702.

■ We now examine the *Daubert/Paoli* factors relating to plaintiff's evidence of specific causation, i.e., whether the platinum salt allergy caused *Diaz's* persistent[25] asthma.

---

**24.** We note that these articles tested the general hypothesis that asthmatic symptoms could persist in some individuals even after exposure to the platinum salts had ceased. They did not test any hypothesis relating to specific causation, i.e., that there is a reliable method for determining whether the asthmatic conditions of any particular former platinum worker was caused by his prior exposure to platinum salts or from some other cause such as smoking, aeroallergens, childhood asthma, etc. Nor did these articles test any hypothesis relating to whether appropriate testing could predict which platinum workers would suffer persistent asthma after they were removed from the platinum-refining workplace.

**25.** As noted earlier, when first questioned on direct examination, Dr. Auerbach unequivocally opined that Diaz's asthma was permanent. In his written report of March 8, 1994, and during

It can be argued that Dr. Auerbach's opinion is supported by the opinions of two other doctors, Drs. Berkowitz and Finkenstadt, who found that Diaz's asthma might be related in part to occupational exposure to platinum. However, plaintiff chose to offer these physicians as fact, rather than expert, witnesses. Indeed, their testimony was not offered either live at the hearing nor through the admission of a deposition transcript. Only short written reports were offered and accepted into evidence. *See supra* ¶ 48.

These reports offer little insight on how the doctors' diagnoses were made. Dr. Finkenstadt says that he has the "impression" that Diaz suffers from chronic bronchial asthma which "may be related to occupational exposure from platinum," while Dr. Berkowitz's report, after noting that his symptoms are "undoubtedly related" to his platinum salt allergy, goes on to report that (i) "[Diaz] has the diagnosis of routine allergies," (ii) "[h]is physical examination and pulmonary function tests reveal minimal airflow obstruction," (iii) half of his condition relates to causes other than the platinum allergy, and (iv) his removal from exposure to platinum salts will suffice to stop "any progression of his obstructive airways disease." (Ex. 3 and 4 to Pl.'s Br.) Neither report, offered without direct testimony or cross-examination, amounts to meaningful support for Dr. Auerbach's opinion of specific causation.

We must also consider whether Dr. Auerbach's methodology has been generally accepted in the scientific community, how Dr. Auerbach's technique compares to standards which have been established to be reliable, and the rate of error factors under *Daubert/Paoli*. Dr. Auerbach found in his March 8, 1994, report that the platinum salt allergy caused Diaz's persistent asthma. The only study on platinum allergy that he had to support his opinion as of March 8, 1994, was the 1990 Brooks article, which only concluded that respiratory problems *may* persist after platinum refinery workers leave the industry.

Dr. Auerbach had not even been aware of this article before receiving it from plaintiff's attorney. Defendant argues that the use of a single inconclusive study is not generally accepted in the scientific community as a reliable means of establishing causation.

Of course, Dr. Auerbach used more than the Brooks study to reach his conclusion. He also knew that some occupational asthma continues after work exposure ceases, and he believed that the platinum allergy might demonstrate a similar pattern. Reasoning by analogy is not *per se* scientifically unsound. *See DeLuca v. Merrell Dow Pharmaceuticals,* 911 F.2d 941, 946 n. 8 (analogizing the chemical structure of Bendectin to substances with a similar structure which have harmed human fetuses); *Chikovsky v. Ortho Pharmaceutical Corp.,* 832 F.Supp. 341, 345–46 (S.D.Fla.1993) (analogizing research on Vitamin A and Accutane to Retin–A).

Nor is Dr. Auerbach's methodology necessarily unreliable solely because the Brooks article is inconclusive. "A cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists." *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529, 1535 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). For example, the New Jersey Supreme Court reversed a directed verdict which precluded epidemiological studies because they did not show a statistically significant association between asbestos exposure and colon cancer. *Landrigan v. Celotex Corp.,* 127 N.J. 404, 605 A.2d 1079, 1088 (1992).[26] If conclusive evidence were necessary to admit Dr. Auerbach's theory on general causation, we might as well be proceeding under the *Frye* general acceptance test rejected by *Daubert.*

The major flaw in Dr. Auerbach's opinion on specific causation is not the absence, *per se,* of definitive scientific literature, although

later testimony at the Rule 104 hearing he sometimes referred to the asthma as persistent. This is more than a semantic difference.

**26.** In *Rubanick v. Witco Chemical Corp.,* 125 N.J. 421, 447, 593 A.2d 733 (1991), the New Jersey

Supreme Court found that the Third Circuit approach to determining reliability of emerging scientific theories of causation in toxic tort cases was compatible to the New Jersey state rules of evidence.

that is an important factor in the overall analysis, but rather his method of eliminating other possible causes of Diaz's asthma. Persistent asthma is an extremely common affliction that has multiple physical, and maybe emotional, causes. A meaningful diagnosis of specific causation must specifically negate other possible causes. Differential diagnosis is particularly significant in this case where there is evidence of (i) lung problems prior to beginning work at JMI, going back even to childhood; (ii) abnormal PFTs during his JMI pre-employment physical; (iii) some family history of asthma and emphysema; (iv) a long history of smoking; (v) possible exposure to industrial allergens at three other places of employment; and (vi) an indication of allergic sensitivity to common aeroallergens.

■ An opinion as to the source of a patient's illness is unreliable if either

(1) the [doctor] engaged in very few standard diagnosis techniques by which doctors normally rule out alternative causes *and* (2) the defendant[ ] pointed to some likely cause of the plaintiff's illness other than the defendant['s] actions and [the doctor] offered no reasonable explanation as to why he or she still believed that the defendant['s] actions were a substantial factor in bringing about that illness.

*Paoli*, 35 F.3d at 760; *see also Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir.1994). The defendant points to several possible causes of Diaz's asthma that Dr. Auerbach either ignores or is unable to satisfactorily discount because he did not have before him all the necessary information. While Dr. Auerbach did use standard diagnostic techniques to measure the extent to which Diaz suffered lung impairment, he did little, if anything, to "rule out alternative causes." *Id.*

Tests had shown that Diaz could well have been allergic to common aeroallergens prior to joining JMI and that these allergies might be responsible for his chronic asthma. Dr.

Auerbach was unaware that NIOSH had informed Diaz that, based on tests taken in late September, 1981, Diaz might have asthma and was allergic to aeroallergens. Although Dr. Auerbach was aware that Diaz had seen an allergist and had been tested, he did not obtain those records, nor did he ask Diaz to undergo new skin tests. Diaz did not inform Dr. Auerbach about the allergies that Dr. Perin had diagnosed. Drs. Epstein, Perin, Finkenstadt and Berkowitz all concluded that Diaz's allergies could be at least the partial cause for Diaz's long term asthma. Dr. Auerbach admitted that if he had considered these allergies in making his diagnosis, he might have determined that Diaz had two problems: long term asthma and platinum salt allergy. This new analysis contradicts other testimony by Dr. Auerbach, who said that he agreed with the opinion that individuals with pre-existing asthma who develop asthma from low levels of irritant fumes or dust at work are not generally accepted as having occupational asthma.[27]

Dr. Auerbach offers no reasonable explanation for dismissing Diaz's fifteen pack year history of smoking. In his opinion, Diaz had not smoked enough to cause asthma and was not old enough to have COPD; furthermore, patients with COPD, who are mostly smokers, have different reactions to certain tests than those with asthma. We believe Dr. Auerbach should have examined the effect of smoking more closely before totally excluding it as a causative factor. Certainly he should have administered bronchodilation to determine the reversibility of Diaz's symptoms, as Dr. Epstein had done. *See supra* ¶¶ 54 and 63.

The sole article on the platinum salt allergy that Dr. Auerbach read specifically noted the strong association between platinum allergy and smoking. In fact, nine out of the ten former refinery workers in that study who tested positive to the cold air challenge test were either current or former smokers. As with the aeroallergens, Drs. Epstein, Perin, Finkenstadt and Berkowitz all concluded

---

**27.** In fact, there is a possibility that Diaz had asthma since he was a teenager. Dr. Perin wondered if Diaz's neonatal collapsed lung or his teenage bronchitis could have effected Diaz's lungs. Dr. Epstein testified that although there is no specific correlation between having bronchitis as a teenager and having asthma, it is not unusual for people to have cough equivalent asthma, an asthmatic condition manifested by a chronic cough.

that Diaz's smoking could be at least the partial cause for Diaz's long term asthma.

Dr. Auerbach also did not adequately examine whether Diaz might have developed asthma from other workplace exposures. His PFT of April 7, 1981, given before starting work at JMI, showed abnormal lung function, *see supra* ¶ 24, and we know that Diaz's jobs prior and subsequent to working at JMI may have required him to use a respirator. Dr. Auerbach did not inquire about the details of these jobs, a significant omission, particularly considering the infrequent occurrence of the platinum allergy in the overall population. Also, despite his knowledge about RADS, Dr. Auerbach was not concerned about Diaz's 1987 hospitalization for chlorine exposure.

Finally, we examine whether Dr. Auerbach has ever utilized his diagnostic method other than for purposes of litigation. Dr. Auerbach admits that Diaz was the first patient he ever diagnosed with platinum allergy. Therefore, his only diagnosis of this specific condition was for the purposes of litigation. As with his testimony on general causation, Dr. Auerbach's testimony on specific causation is not sufficiently reliable to be admissible under Rule 702.

### C. *Rule 702—Fit*

The final requirement of Rule 702 is that the expert witness must be able to assist the trier of fact to reach accurate results. This is the so-called "fit" requirement. *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795–96; *Paoli,* 35 F.3d at 742–43. The question of fit is whether the testimony can be applied to the facts at issue. *Habecker v. Clark Equipment Co.,* 36 F.3d 278, 290 (3d Cir.1994) (holding that a simulation of an accident did not meet the fit requirement because the conditions of the simulation were far different from those existing at the time of the accident), *cert. denied,* —— U.S. ——, 115 S.Ct. 1313, 131 L.Ed.2d 195 (1995). Whether expert testimony fits "depends on the 'proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the

case.'" *Paoli,* 35 F.3d at 743 (quoting *United States v. Downing,* 753 F.2d 1224, 1237 (3d Cir.1985)).

Because we have found that Dr. Auerbach's testimony as to general and specific causation is unreliable, it seems strange to talk about the "fit" of such testimony or its helpfulness to the trier of fact. However, "fit" does not seem to be a real issue in this case, and were Dr. Auerbach's opinions otherwise reliable, they would probably fit the facts of this case. *Compare, Habecker, supra; United States v. Lilly,* 37 F.3d 1222 (7th Cir.1994) (in tax evasion case against clergyman and his wife, expert testimony of general duties of a pastor's wife did not "fit" where the issue was whether those duties would render wife incapable of willingly evading tax), *cert. denied,* —— U.S. ——, 115 S.Ct. 1155, 130 L.Ed.2d 1112 (1995); *Joiner v. General Electric Co.,* 864 F.Supp. 1310 (N.D.Ga.1994) (where issue was whether PCB's caused plaintiff's cancer, expert testimony on the carcinogenic nature of furans and dioxins did not "fit" in the absence of proof that these substances were contained in the PCBs to which plaintiff was exposed).

### D. *Conclusion*

Thus the Court finds as a matter of law that Dr. Auerbach's testimony fails to meet either the qualifications or the reliability requirements of Fed.R.Evid. 702. Asthma is a disease suffered by millions of Americans and caused by a multitude of factors. Dr. Auerbach is not qualified to testify that the platinum allergy is a source of chronic asthma which persists after exposure to platinum salts ceases, and his opinion that the platinum allergy is the specific source of Diaz's asthma is inadequately supported, particularly with respect to his differential diagnosis. Defendant's motion to strike Dr. Auerbach as an expert is granted.[28]

## IV. SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and

---

**28.** The Court does not address defendant's argument that Dr. Auerbach's testimony should be excluded under Rules 703 and 403, having already excluded it under Rule 702.

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

 The only other evidence that plaintiff has regarding causation besides Dr. Auerbach's testimony is the worker's compensation judgment. We held *supra* that the worker's compensation court's decision regarding the plaintiff was not conclusive. However, the compensation court's decision may be evidential. *Wunschel v. Jersey City*, 96 N.J. 651, 666–67, 477 A.2d 329 (1984) (worker's compensation determination should be used as evidence in subsequent wrongful death action); *Bucuk v. Edward A. Zusi Brass Foundry*, 49 N.J.Super. 187, 139 A.2d 436, 452 (App.Div.) (worker's compensation judgment admitted into evidence), *certif. denied*, 27 N.J. 398, 143 A.2d 9 (1958).

On April 14, 1992, the Honorable Francis S. Munyon, Judge of Compensation, stated:

[T]he Petitioner by his credible testimony, as well as the reports of all the doctors, has proven to the Court that he does have a permanent injury of such a nature that it does affect his ability to work and does affect his life style [sic] to a material degree. Much of the objective evidence, since this is a pulmonary claim, is in the form of reports of doctors.

I therefore adopt their findings as part of my findings and I find that as a result of those exposures, the Petitioner has a disability of 20 percent of partial total, for the pulmonary residuals of exposure to the platinum salt, with the resulting reacting disability.

Ex. B. to Sept. 8, 1994 Greenbaum Aff.[29]

It is clear from this excerpt that Judge Munyon has merely adopted the findings of the two doctors whose opinions were presented at the worker's compensation hearing, Drs. Berkowitz and Finkenstadt. The doctors from the worker's compensation hearing were only offered as fact witnesses, not experts, in the matter before this court. Even if we were to admit the worker's compensation ruling into evidence, the plaintiff would be unable to present expert testimony on the elements of general or specific causation. Without expert testimony, the plaintiff cannot establish a genuine issue of material fact. Therefore, the defendant's motion for summary judgment is granted.[30]

---

29. This affidavit was filed in support of defendant's previous motion for summary judgment.

30. Having decided to exclude Dr. Auerbach's testimony, we need not address the defendant's argument that summary judgment would be warranted even if Dr. Auerbach's testimony had been admitted.