William POUST and Kimberly
Poust, Plaintiffs,

v.

HUNTLEIGH HEALTHCARE,
Defendant.

Civil Action No. 94-6063 (MLC).

United States District Court,
D. New Jersey.

March 30, 1998.

William A. Loftus, Shager, McDaid, Loftus, Flum & Spivey, Philadelphia, PA, for Plaintiffs.

Thomas J. Herten, Jason T. Shaffron, Herten, Burstein, Sheridan, Cevasco, Bottinelli & Litt, L.L.C., Hackensack, NJ, for Defendant.

## MEMORANDUM OPINION

COOPER, District Judge.

There are two motions before the Court in this matter: (1) defendant Huntleigh Healthcare's ("Huntleigh") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56; and (2) plaintiffs, William and Kimberly Pousts' motion in limine for an Order applying Pennsylvania law on the issue of the calculation of damages. The Court held a Federal Rule of Evidence 104 hearing on defendant's motion for summary judgment on November 6 and 7, 1997. Because we have determined that (1) the opinions of Robert Benowitz and Carl Goodman, M.D. are admissible pursuant to Rule 702 of the Federal Rules of Evidence, and (2) the opinion of Ray Eric Santos, M.D. is admissible pursuant to Rule 701 of the Federal Rules of Evidence, defendant's motion for summary judgment is denied. Further, plaintiffs' motion in limine seeking an Order applying Pennsylvania law on the issue of damages is denied. The Court finds that any calculation of future lost earnings will be governed by the law of the state of New Jersey.

## BACKGROUND

Plaintiffs William K. Poust ("Poust") and Kimberly Poust [1] bring this negligence and strict products liability action and loss of consortium claim against defendant Huntleigh Healthcare as a result of complications during back surgery performed on Poust at the National Naval Medical Center in Bethesda, Maryland. Poust was a career Navy Petty Officer stationed at Willow Grove Naval Air Base. On April 6, 1994, after suffering from back pain caused by a spondylolesthesis condition, Poust underwent a laminectomy and fusion at the National Naval Medical Center. The chief surgeon was R. Eric Santos, M.D., assisted by Orvis Chitwood, M.D.

Throughout surgery, Poust wore surgical stockings, commonly referred to as "TEDs" that reached above his knees.[2] His legs were also connected to a Flowtron DVT device ("Flowtron") manufactured by Huntleigh Healthcare in order to reduce the risk of deep vein thrombosis, a condition which occurs from lack of blood flow to the calf muscles. The Flowtron DVT consists of calf-high (i.e., above the ankle and below the knee) pneumatic compression cuffs[3] and air hoses leading to a pump which, when functioning properly, provides intermittent cycles of compressed air to bladders sewn into the back of each legging. The pump also contains a dial which is intended to set the amount of pressure exerted on the calves, and an auditory and visual alarm. The Court will collectively refer to these discrete parts of the Flowtron DVT as "the pneumatic compression device."

The pneumatic cuffs used during surgery remained on Poust post-operatively, however the operating room pump was replaced at least two times over the next two days.[4] Upon awakening in the recovery room, Poust complained of bilateral pain in his calves. By April 8, 1994, which was the second day after the back surgery, Dr. Santos suspected that Poust's pain was caused by bilateral compartment syndrome, a condition caused by a decrease in the venous outflow which in turn is a response to an increased pressure within the compartment of the calf muscle. (Pls.' Statement of Mat. Facts in Dispute, Ex. 13 at 36: (Chitwood Dep.)) Tests were performed which confirmed Santos' diagnosis. That same day, Dr. Chitwood, Poust's other physician, performed an emergency facsiotomy on him, with Dr. Santos assisting him.

---

1. Unless specifically noted herein, any reference to "Poust" is to plaintiff, William Poust.

2. The manufacturer of the surgical stockings is unknown.

3. The Court notes that these are often referred to as pneumatic leggings or garments. For purposes of this motion, the Court will refer to this part of the Flowtron DVT as "pneumatic cuffs."

4. Plaintiffs have been unable to identify any of the pumps used during or after the operation, as they were placed back in service.

As will be discussed in more detail below, a fasciotomy is a surgical procedure in which the doctor cuts through the protective sheath over the affected compartments to reduce the pressure on those muscles. (*Id.*, Ex. 14 at 35: (Santos Dep.)) The operative notes of this first facsiotomy performed on April 8, 1994 report that "[i]t was noted that there was a well-demarcated area of dusky muscle distally in the compartment." The muscle proximally in the compartment looked normal. . . . On [the right] leg as well, there was a well-demarcated area in the anterior compartment of dusky muscular tissue. (*Id.*, Ex. 15 (post-operative notes (April 8, 1994)).) Poust underwent two additional procedures to alleviate the pressure in his calves, on April 10 and April 12, 1994 respectively. His discharge summary, written by Dr. Chitwood, states, "At fasciotomy, the muscle in the anterior and lateral compartments was noted to be normal with the exception of the distal third of both sides which had a well demarcated area that was later found to identically match the lower cuff of the venodyne compression stockings [venodyne being used to describe the Flowtron calf-high leggings] that had been placed on him intraoperatively." (Certif. of Jason Shaffron in Supp. of Def.'s Mot. for Summ.J., Ex. B: Discharge Summ. dated June 18, 1994 at 2–3.)

The fasciotomy and subsequent operations were of limited success, as Poust continues to suffer from compartment syndrome in both calves. Plaintiffs filed this lawsuit in December 1994, alleging negligence, strict products liability and loss of consortium claims against defendant. Poust alleges that the Flowtron DVT pneumatic compression device used either during surgery or in the recovery room malfunctioned and caused his compartment syndrome. (Am.Compl. ¶ 7–8.) Poust further alleges that the malfunction was caused by defendant's (1) failure to properly design, manufacture and test the Flowtron DVT device; (2) failure to provide adequate and/or prominent instructions and/or warnings and/or labels; and (3) failure to adequately warn of the risks involved in using the Flowtron device. (*Id.* ¶ 9–10.)

Defendant moves for summary judgment, which plaintiffs oppose. In addition, plaintiffs have filed a motion *in limine* for an Order allowing any damage calculation to be made pursuant to Pennsylvania law. Defendant opposes plaintiff's *in limine* motion.

Because defendant's motion for summary judgment hinges on the admissibility of plaintiffs' experts' testimony,[5] the Court held a two-day hearing on the admissibility of those opinions pursuant to Rule 104 of the Federal Rules of Evidence. *See In re Paoli Yard Litigation*, 35 F.3d 717, 741 (3d Cir. 1994) ("*Paoli II*") (discussing the Court's decision in *Paoli I* to reverse district court's exclusion of expert testimony under Rule 702, and stating that district court should have held an *in limine* hearing before excluding plaintiffs' expert testimony), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). The Court heard testimony from Drs. Santos and Goodman[6] which

---

**5.** We note that in a letter to the Court, defendant states that its summary judgment motion is not based on the inadmissibility of the expert's opinions, but instead is premised upon the fact that the expert's opinions, even if admissible, do not establish a factual issue concerning defect and causation for the jury. Ltr. from Thomas Herten to Hon. Mary L. Parell (Cooper) (Oct. 30, 1997). This argument, however, is not readily apparent from defendant's moving papers. Moreover, because the experts' opinions are admissible, those opinions could be credited by the trier of fact, and therefore create a factual issue for the jury to resolve.

**6.** At the time of defendant's motion for summary judgment, the parties submitted deposition transcripts, curriculum vitae, and three expert reports from Mr. Benowitz. Moreover, the Court had before it the curriculum vitae and expert report of Dr. Goodman. Dr. Goodman has not been deposed. At the time of oral argument on defendant's motion for summary judgment, the Court found that it needed additional testimony from Drs. Goodman and Santos in order to determine the admissibility of their opinions. The Court also determined, however, that additional testimony from Robert Benowitz was unnecessary, as the Court had before it sufficient evidence in the record to make the admissibility determination. Accordingly, the Court proceeds to consider the admissibility of the opinions offered by Benowitz, Santos and Goodman in light of the additional testimony, deposition transcripts, other relevant documents and oral argument. *See Rutigliano v. Valley Business Forms*, 929 F.Supp. 779, 783 (D.N.J.1996), *aff'd*, 118 F.3d 1577 (3d Cir.1997).

focused heavily upon the basis for their conclusions as to the cause of Poust's compartment syndrome. At the conclusion of the testimony, both parties were offered the opportunity to present additional argument in support of their positions.

## DISCUSSION

### A. Defendant's Motion for Summary Judgment

#### 1. Rule 104 Hearing

Because this Court held an evidentiary hearing pursuant to Federal Rule of Evidence 104, the outcome of which is dispositive of defendant's motion for summary judgment, it is appropriate to begin our analysis with our findings of fact and conclusions of law from that hearing held before the Court on November 6 and 7, 1997. *See Diaz v. Johnson Matthey, Inc.*, 893 F.Supp. 358, 362 (D.N.J.1995).

#### a. Findings of Fact

1. Ray Eric Santos, M.D. is a board-certified orthopedic surgeon who specializes in spine surgery. (Santos, Tr. 1 at 5.)[7]

2. Dr. Santos attended medical school at Texas Tech University in Lovett, Texas. Upon graduation, he completed an orthopedic residency program at the University of Texas. After that program, he completed a one year fellowship in spine surgery in San Antonio. After his fellowship, Dr. Santos went to the National Naval Medical Center in Bethesda, Maryland ("Navy Medical"). (*Id.* at 4.)

3. At Navy Medical, Dr. Santos was an attending physician in orthopedic surgery and the Chief of Spine Service at the National Naval Medical Center. (*Id.* at 5.) After leaving Navy Medical, Dr. Santos entered private practice for one year. Currently, he is a professor of orthopedic surgery at the University of Texas, Medical Branch, located in Galveston, Texas. (*Id.*)

4. Dr. Santos has performed approximately 1,200 back surgeries throughout his career. (*Id.* at 6.) Dr. Santos was the attending physician at Navy Medical for the initial back surgery performed on Poust.

5. Santos first met William Poust when plaintiff went to the orthopedic clinic at Navy Medical complaining of back and right leg pain. Santos diagnosed Poust as having L5/S1 isthmic-type spondylolisthesis. After several attempts at non-operative treatment, he went back to Navy Medical for surgery to correct his problem. He underwent a laminectomy and fusion of the S1 and L5 vertebrae. (*Id.* at 29–30.)

6. There are operating tables developed specifically for use during spine surgery. One of those types of tables, the Andrews Spinal Table, was used during Poust's surgery. (*Id.*)

7. The Andrews Spinal Table was designed to alleviate any pressure points during spine surgeries. The Andrews Spinal Table allows the patient's abdomen to hang free and has a frame which has padded supports placed at the patient's chest, iliac crest, legs and thighs. (*Id.* at 8.)

8. Poust was placed on the table, supported by portions of the padded frame which contacted Poust at his rib-cage, the iliac crest (pelvis), leg (from mid-thigh to ankle). (*Id.* at 12–13.) The operating nurses positioned Poust on this table. (*Id.* at 112.) The operating room nurses placed additional pillows underneath Poust's thighs, knees and calves. (*Id.* 12–13.)

9. After positioning Poust on the Andrews Table, Santos checked the contact points to confirm that his positioning was correct and did not inhibit perfusion of blood to Poust's extremities. (*Id.* 14–15.)

10. Poust was attached to a pneumatic compression device manufactured by defendant, Huntleigh Healthcare. (*Id.*)

---

7. "Tr. 1 at ——" refers to the testimony by Ray Eric Santos, M.D. taken on November 6, 1997. "Tr. 2 at ——" refers to the transcript of the testimony of Carl Goodman, M.D. taken on November 7, 1997.

11. Santos is familiar with pneumatic compression devices in general, as they are routinely used in spine surgeries to compress the muscles in the patient's lower extremities and help the venous blood flow. (*Id.* at 20–21.)

12. Pneumatic compression devices are used in spinal surgeries to prevent deep vein thrombosis. Deep vein thrombosis occurs when there is a decreased blood flow to the patient's lower extremities, which then causes the patient's blood to clot and adhere to the veins in the patient's leg. (*Id.* at 18.)

13. One aspect of the pneumatic compression device used on Poust is the pneumatic cuff. The cuff is comprised of the following components: (1) a fabric cuff unit fastened by velcro tabs which are wrapped around the patient's leg; (2) a plastic bladder which is inside the fabric cuff; and (3) a connection point on the bladder which connects to a hose. The hose runs from the air pump outside the cuff to the bladder which is inside the cuff. The bladder intermittently . inflates and deflates to provide pressure to the calf muscle. (*Id.* at 24, 68). The velcro tabs are placed at the front of the leg, and the bladder is positioned to exert pressure on the four compartments in the calf muscles. (*Id.* at 71.)

14. Another aspect of the pneumatic compression device is the pressure-setting dial which allows the operating room staff to set the amount of pressure to be exerted into the bladder. (*Id.* at 23–24.) The recommended setting for the pressure gauge in the Flowtron DVT device is 40 millimeters of mercury. (*Id.*)

15. Santos did not place the pneumatic cuffs on Poust. (*Id.* at 107.)

16. Poust also wore thigh high anti-thrombobolic disease hose, commonly referred to as "TEDs" during his initial surgery. TEDs are also used to prevent venous stasis in the superficial veins, but do not provide a sufficient level of compression to affect the deep veins. (*Id.* at 27.)

17. Santos successfully performed the laminectomy and fusion as intended. After the surgery was complete, Poust awoke in the recovery room complaining of severe pain in the lateral aspect of his calves. (*Id.* at 35–37.)

18. Santos performed a differential diagnosis to determine the cause of Poust's pain. His methodology included the following steps: (1) examining the musculature for any swelling or tense compartments of the muscle; (2) monitoring and testing the pressure in both calf muscles; (3) testing for pain on passive motion of Poust's legs; (4) testing for decreased sensation in the problem area (paraesthesis); and (5) determining if the affected muscles were weak (paresis). This methodology confirmed Santos' suspicion of compartment syndrome as the cause of Poust's pain. (*Id.* at 39–43.)

19. Santos is familiar with the existence, diagnosis, and treatment of compartment syndrome. He first heard of the condition in medical school, and he routinely encountered it during his residency and now teaches his students about it. (*Id.* at 46.)

20. Compartment syndrome is a condition that results from elevated pressure within a closed osteofascial compartment. This elevated pressure, if high enough, can reduce muscle perfusion below the level necessary for cellular viability. (*Id.* at 48.)

21. The human calf contains four compartments, each essentially containing muscles, veins, arteries and nerves encased in a plastic-like sheath called fascia. (*Id.* at 50.) Poust's compartment syndrome is located in the lateral and anterior compartments of both of his calf muscles, which are found in the front and side of the lower leg. (*Id.* at 51, 80.)

22. Poust's compartment syndrome was treated by performing a fasciotomy on each of Poust's calves. A fasciotomy is a surgical procedure where an incision is made into the fascial layer encasing the affected compartment to relieve the pressure in that compartment. (*Id.* at 52–53.) After the initial fasciotomy, two

subsequent procedures were performed. These two subsequent procedures required an irrigation of the compartment, followed by a debridement (removal) of the dead tissue to alleviate some of the pressure in the affected compartments. (*Id.* at 67.)

23. The fasciotomy and subsequent irrigation and debridement procedures were performed by Orvis Chitwood, M.D., with Santos serving as the supervising surgeon. (*Id.*)

24. The fasciotomy occurred on April 8, 1994. During the fasciotomy, Dr. Chitwood accidentally cut a branch of the perineal nerve, which in some instances causes a decreased sensation in the patient's foot. It would not, however, affect the patient's ability to move the foot. (*Id.* at 54–55.)

25. Once Dr. Chitwood cut the fascial layer of Poust's anterior and lateral compartments during the fasciotomy, Dr. Santos noted that a portion of the musculature in those compartments were a dark and dusky color, non-contractile, and non-viable. (*Id.* at 55.) Also at that time, Dr. Santos noted a "clear demarcation ... a clear line between viable muscle at the proximal or the top part of the anterior compartment, as opposed to distally or down the leg.... And that was found on both sides." (*Id.* at 56.) At the top part of each of Poust's calf muscles, the muscle was "healthy, pink, very contractile to stimulation." (*Id.* at 57.)

26. Each of the four compartments of the leg is encased in a fascial sheath, and each compartment runs vertically from the knee to just below the ankle. Normally when compartment syndrome is diagnosed in a patient, it affects the entire compartment of the leg. (*Id.* at 58.)

27. The post-operative notes discuss Santos' findings during the fasciotomy and provide measurements of the location of the dead tissue. The line of demarcation where the dead muscle began was at approximately the distal half or the distal two-thirds of the lower leg. More specifically, from the patient's medial malleolus (the ankle joint) up seven centimeters (at the tendinous junction of the muscle), Dr. Santos noted no compartment syndrome. From about that same area (where the tendons became muscles) to approximately 12 centimeters up the calf, the muscle was dead. The remaining portion of the muscle was viable. (*Id.* at 64.)

28. During the second or third irrigation and debridement procedure, Santos compared the pneumatic cuffs to the dead muscle found on both of Poust's anterior and lateral compartments. Santos found that Poust's injuries corresponded to the placement of the cuff during surgery. (*Id.* at 67.) More specifically, when inflated, the pressure in the bladder is greatest in the middle, which causes the bladder to form into an "elongated sphere." Santos noted that the placement of the elongated sphere "approximated very closely where the patient's compartment was [located]." (*Id.* at 69.)

29. Santos attempted to determine the cause of Poust's compartment syndrome. Santos eventually concluded, with a reasonable degree of medical certainty, that Poust's compartment syndrome was caused by excessive pressure from the Flowtron DVT. (*Id.* at 93.)

30. He considered and ruled out several potential causes, including: (1) the type of operating table used for the surgery; (2) the patient's positioning during surgery; (3) the TEDs worn during the surgery; (4) undue pressure caused by outside forces such as operating room personnel leaning on the patient or placing instruments on the sheets covering the patient; (5) pressure points where the patient's body came into contact with the table; and (6) the TEDs or cuffs being ill-fitted and too tight for the patient's size. Santos also considered these factors along with his observations of the nature of the plaintiff's injury and his past medical history. (*Id.* at 74–85.)

31. Dr. Santos considered the operating table used for Poust's surgery. He ruled it out as a possible cause because the table was specifically designed to avoid these problems during spinal surgery.

32. Santos also considered whether Poust's positioning during surgery could have caused the problem. The point at which the patient's legs contacted the operating table was at or near the affected compartments. However, Santos ruled this out as a potential cause because: (1) additional pillows were placed at this contact point to provide more padding for the patient; (2) Santos was unable to find one reported case of compartment syndrome with a patient positioned in the prone position on the Andrews table; and (3) Santos checked plaintiff's pulse after he was positioned but before the surgery to ensure that the blood was flowing properly to the lower extremities. (*Id.* at 76–77, 79.)

33. Santos also considered and ruled out the size of the TEDs, and the possibility that they "kinked" or "bunched up" creating a tourniquet-like effect, because the TEDs could not generate enough pressure to cause compartment syndrome. (*Id.* at 81.) In reaching that conclusion, Santos did not speak to the member of the nursing staff responsible for fitting and placing the TEDs on plaintiff. (*Id.* at 103.)

34. Santos next considered any outside forces of pressure, such as operating room personnel leaning on the patient or placing instruments on him. Santos ruled this out as a possibility because of the distribution of the compartment syndrome on the calf muscle. (*Id.* at 82.)

35. Next, Santos reviewed Poust's medical history to determine if there were any predisposing factors which would make him more prone to the disease. Santos concluded that Poust did not suffer from chronic exertional compartment syndrome. (*Id.* at 82–84.)

36. Santos also considered whether the pneumatic cuffs were too tight, but ruled this out as a possibility. (*Id.* at 85.) He did not place the cuffs on the patient and did not personally interview the operating room staff to determine who was responsible for putting the cuffs on plaintiff's legs. (*Id.* at 107.)

37. Because Poust's calves were larger than average, Santos also considered the possibility of human error. For example, he questioned whether the cuffs placed on Poust were too small. Santos ruled this out as a potential factor because of the strict procedures followed at Navy Medical. (*Id.*)

38. When Dr. Santos made his diagnosis of the cause of compartment syndrome, he believed there was nothing in the medical literature that causally connected compression devices with compartment syndrome. (*Id.* at 101.)

39. Subsequently, a literature search revealed references to that complication which escaped Dr. Santos' initial search. (*Id.*)

40. Robert B. Benowitz is an engineer who provided three expert reports on the issue of whether the Flowtron DVT Model AC500 was in any way defective. (Pls.' 12 G Stmt., Part II, Ex. 10.)

41. Benowitz holds a B.S. in electrical engineering from Lehigh University, and a J.D. from Temple University. (*Id.*, Ex. 11.)

42. Currently, Benowitz is employed by RMS Associates as a Safety Consultant. (*Id.*) He has been employed there since 1971. In this position, he investigates electro-mechanical equipment incidents, provides consulting services to health care institutions, conducts safety training, and analyzes health care equipment requirements. (*Id.*)

43. His curriculum vitae claims that his areas of expertise include hospital and health safety and medical devices—use, safety and design.

44. Benowitz has presented papers on the issues of products liability, biomedical devices and hospital safety, and has analyzed the safety of several health care devices. (*Id.*)

45. Benowitz examined a Flowtron DVT machine manufactured by Huntleigh Healthcare which was similar to the machine used during Poust's back surgery. (*Id.,* Ex. 11: (1) Jan. 4, 1996 Report, (2) Oct. 3, 1996 Report.)

46. He also reviewed the following documents prior to rendering his conclusions: (1) Excerpts from Poust's medical records from Bethesda Naval Hospital; (2) sales literature from defendant that includes results of a study regarding the efficacy of the Flowtron DVT versus the Kendall SCE Model 5325 system; (3) a "sell sheet" for the Flowtron DVT; (4) the Flowtron DVT Service Manual; (5) the Flowtron DVT Operating Manual; (6) Instructions for use of the pneumatic compression cuffs; (7) Documents from Kendall including Kendall sales information and Huntleigh sales information; (8) an article entitled *Pneumatic Compression for the Prevention of Deep Vein Thrombosis: An Overview;* (9) purchasing information from Bethesda Naval Hospital; (10) an article entitled *Femoral Vein Blood Velocities with Intermittent Compression Systems: Implications for DVT Management;* (11) plaintiffs' Amended Complaint; (12) defendant's Answer; (13) various interrogatories answered by defendant; and (14) various deposition transcripts. (*Id.:* (1) Jan. 4, 1996 Report at 2; (2) Oct. 3, 1996 Report at 2–3.) He also states that he reviewed the following additional material prior to rendering his April 29, 1997 Report: (1) Flowtron DVT "Garment Pressure Decay Tests"; (2) drawings of the device; and (3) explanations of device operation; and (4) technical articles pertaining to DVT prevention. (*Id.:* Apr. 29, 1997 Report.)

47. Benowitz found several defects in the Flowtron DVT device and the accompanying Service Manual. The defects with the Service Manual included the following omissions: (1) the Manual's check-out procedure which requires the technician to check pressure and the alarms on the machine does not indicate the proper method or instruments necessary for completing the check; (2) the Manual does not provide any information regarding adjustment or repair of the alarms if they do not work properly; (3) the Manual does not provide any indication of what steps the technician should take if the unit does not meet the pressure specifications; (4) the Manual does not state whether or not the machine may be repaired in the field; (5) the Manual does not discuss the significance of problems associated with excessive pressure and alarm failure; and (6) it fails to identify the time-period within which the alarms and pressures should be tested. (*Id.:* (1) January 4, 1996 Report, at 3–4; (2) Oct. 3, 1996 Report at 4–5.)

48. Benowitz also identified other conditions in the Flowtron DVT Model AC 500 which, in his opinion, rendered the machine defective. More specifically, he identified the following as defects in the product: (1) the alarm on the machine is not loud enough; (2) the device does not have any mechanism which measures the actual pressure exerted by the machine; (3) the machine does not have a fail-safe mechanism which would automatically shut off the device should an excessive or continuous pressure condition occur; (4) the alarm fails to indicate when a kink in the tubing prevents the bladder from deflating. (*Id.:* (1) Jan. 4, 1996 Report at 4; (2) Oct. 3, 1996 Report at 3–5.)

49. Robert Benowitz offered his opinion with respect to the cause of plaintiff's injury. He stated that "[t]he defects in design and lack of appropriate warnings and instructions were directly related to William Poust's injuries sustained on April 6, 1994, and were caused by the manufacturer, Huntleigh Healthcare, a Division of Huntleigh Healthcare." (*Id.*)

50. Carl Goodman, M.D. was retained by plaintiffs as an expert in this case. (Tr. 2 at 2.) His primary focus was on the

rehabilitative possibilities available to Poust. (*Id.* at 19.)

51. Dr. Goodman received his medical degree from Downstate Medical School, State University of New York. (*Id.* at 3.) He completed an internship at Kings County Hospital, Brooklyn, New York, in medicine and pediatrics, and a three year residency in physical medicine and rehabilitation which he completed at State University Hospital and Kings County Hospital. (*Id.*) After service in the United States Navy, he was Director of Physical Medicine and Rehabilitation at Saint Albans Naval Hospital in Queens, New York. He was an assistant professor for four years at Downstate. Subsequently, he was Director of Physical Medicine and Rehabilitation at Montgomery Hospital. He is currently in his own private consulting practice. (*Id.* at 4.)

52. Dr. Goodman is a physician who practices physical medicine. Physical medicine and rehabilitation is a field which is devoted to the diagnosis and rehabilitation of neuromuscular and skeletal abnormalities, injuries and diseases and the rehabilitation therein to make that individual capable of performing as close to or at normal levels again. (*Id.*)

53. Throughout his practice over the past 30 years, Dr. Goodman has used various types of pneumatic compression devices for the relief of lymphedema, edema of the extremities, phlebitis and deep vein thrombosis. (*Id.* at 5–6.)

54. Dr. Goodman is familiar with compartment syndrome both from his years of practice and training in medical school. (*Id.* at 13.)

55. Dr. Goodman has diagnosed individuals with compartment syndrome during his practice of physical medicine. (*Id.* at 14.)

56. Dr. Goodman took Poust's medical history. (*Id.* at 21–22.) He indicated that he did not find anything in his past medical history which could have contributed to his development of compartment syndrome. (*Id.*)

57. Dr. Goodman also performed a physical examination of Poust. (*Id.* at 22.)

58. Dr. Goodman did not perform any laboratory tests in forming his opinion as to the cause of Poust's compartment syndrome. (*Id.* at 22–23.)

59. Dr. Goodman utilized the process of differential diagnosis to reach his conclusions as to the cause of Poust's injuries. (*Id.* at 23.) In performing his differential diagnosis, he considered several alternative causes of Poust's compartment syndrome. (*Id.* at 25.) He also reviewed the operative reports from the initial back operation. (*Id.*)

60. Dr. Goodman considered whether Poust's positioning could have caused this injury. He ruled this out as a potential cause based upon the fact that placement of a patient in prone position during surgery puts him at no risk of compartment syndrome as compared to the lithotomy position, which is a position known to cause or to be a factor in the causation of compartment syndrome. (*Id.* at 27.) He also ruled out positioning based upon the fact that the table was padded. (*Id.*)

61. Dr. Goodman next considered the Andrews Spinal Table itself. During his testimony, he ruled that out as a potential cause because of the padding on the table. Additionally, he stated that if the table caused the compartment syndrome, Poust would have also developed a pressure narcosis over the tibia, which did not occur. (*Id.* at 26.)

62. At the time Dr. Goodman rendered his opinion regarding the cause of Poust's injuries, he did not know whether the table was padded, or whether the nurses provided extra padding. (*Id.* at 69.)

63. He was not aware of the practice at Bethesda Naval Hospital with respect to padding of patients who would be prone during surgery during an operation. (*Id.*)

64. Dr. Goodman considered whether ill-fitting TEDs could have caused the compartment syndrome. He ruled this out as a potential cause, finding that the

TEDs could not generate enough pressure to cause compartment syndrome. He also opined that ill-fitting TEDs would have caused other complications, such as gangrenous ulcers on Poust's feet, which did not develop in this case. (*Id.* at 28.) Moreover, he explained that if the TEDs were too small, they would have "rolled down," and "bunched-up," but that such a result would not have caused Poust's compartment syndrome because TEDs lose their constrictive ability when they roll down. (*Id.* at 81.)

65. Dr. Goodman did not consider the possibility that the venodyne cuffs were ill-fitted and too tight for Poust when he made his initial determination regarding the cause of Poust's injuries. (*Id.* at 29.) However, after being questioned concerning whether this could have possibly caused Poust's compartment syndrome, Dr. Goodman stated that if the lower strap of the cuff was too tight, it could not cause this injury because that strap was below the bulk of the muscle and would not coincide with the injured muscle. He indicated, however, that if the strap on top were too tight, such a condition could have caused "something to happen." (*Id.*)

66. Dr. Goodman next considered whether Poust's compartment syndrome could have been caused by someone leaning on his legs or placing instruments on his calves. (*Id.*) He discounted this theory because such pressure would not cause "any overall effect." (*Id.*)

67. Dr. Goodman also considered whether anesthesia could have caused the compartment syndrome. (*Id.* at 77.) He rejected it as a potential cause based upon the anesthesia record, because there was no evidence of any problems caused by anesthesia which would have put Poust at risk of compartment syndrome. (*Id.*)

68. Dr. Goodman's ultimate conclusion was that "the external compression device which was applied during surgery was the cause of the compartment syndrome." (*Id.* at 40.)

69. In rendering his opinion, Dr. Goodman did not conduct a literature search. (*Id.* at 51.) Further, he did not interview anyone at Bethesda Naval Hospital or inspect the table used during the surgery. (*Id.* at 78–79.) He relied in part upon the opinions of Dr. Santos and Chitwood. (*Id.*)

b. *Conclusions of Law* [8]

We will begin our discussion by briefly outlining the parties' contentions. Defendant argues that it is entitled to summary judgment on the underlying products liability claim because Poust cannot establish two necessary elements of his prima facie case.[9] First, defendant claims that plaintiffs have not introduced any admissible evidence that the Flowtron DVT is defective. Second, defendant maintains that plaintiffs have failed to produce any admissible evidence that Poust's compartment syndrome was caused by the malfunction of the Flowtron DVT device. Defendant recognizes that plaintiffs have produced expert witnesses who purport to testify on the issue of defect and causation, namely Robert Benowitz, and Carl Goodman, M.D. However, defendant argues that the opinions of these witnesses are inadmissible pursuant to Rules 702, 703 [10] and 403 of the Federal Rules of Evidence. Defendant

---

8. To the extent that the "Conclusions of Law" portion of this Memorandum Opinion contains findings of fact in addition to those set forth above, they shall be deemed to be part of the "Findings of Fact."

9. Because Kimberly Poust's loss of consortium claim is a derivative claim, defendant argues that it is entitled to summary judgment on her claim as well.

10. Defendant does not articulate how Rule 703 applies to the testimony of Goodman, Benowitz or Santos. Rule 703 of the Federal Rules of Evidence states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
> Fed.R.Evid. 703.

maintains that without the experts' testimony, plaintiffs' claims fail as a matter of law because expert opinion is essential for establishing defect and causation in this case. (*Id.* at 3.) Furthermore, defendant argues that the opinion of Poust's treating physician, Dr. Santos, as to the cause of Poust's compartment syndrome, is inadmissible because he was not listed as an expert retained in this case. (*Id.* at 21.) Finally, defendant maintains that plaintiffs are improperly attempting to invoke the doctrine of *res ipsa loquitur* in this case. Defendant states, however, that the elements required for *res ipsa loquitur* are not satisfied. (*Id.* at 23–28.)

Plaintiffs oppose defendant's motion for summary judgment, arguing that each of their expert witnesses has provided admissible expert testimony on the issues of product defect and causation. First, Poust argues that the opinions of Robert Benowitz and Carl Goodman meet the reliability requirement under Rule 702 because they have "based their opinions on valid principles and methodology of medicine and engineering." (Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. at 8.) Furthermore, Poust contends that the opinion of Dr. Santos should be admitted on the issue of causation, as he was Poust's treating physician who first diagnosed the problem. Poust states that Santos was listed as a witness in the Final Pre-trial Order, and as such, should not be excluded simply because he was not listed as an expert witness. (*Id.* at 10–11.) Finally, plaintiffs state that they are not relying on the doctrine of *res ipsa loquitur,* but instead advance a malfunction theory of liability. (*Id.* at 11.)

■ Rule 104(a) states in pertinent part that "[p]reliminary questions concerning the qualifications of a person to be a witness, ... or the admissibility of evidence shall be determined by the court." Fed.R.Evid. 104.

As a preliminary matter, a proponent of expert testimony must establish his expert is qualified and his testimony is admissible by a preponderance of the evidence. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 593 n. 10, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Diaz,* 893 F.Supp. at 372.

■ While defendant cites to Rules 702, 703 and 403 of the Federal Rules of Evidence in support of its motion for summary judgment, in substance, it seeks exclusion of the testimony under Rule 702. Thus, we have limited our discussion to the admissibility of the witnesses' testimony under that rule.[11] Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Rule 702 has three requirements: (1) the witness must be qualified to be an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact. *Paoli II,* 35 F.3d at 741–43. These three requirements are often referred to as qualification, reliability and fit. *See Rutigliano v. Valley Business Forms,* 929 F.Supp. 779, 783 (D.N.J.1996). Rules 104 and 702 require a district court, when faced with a proffer of expert testimony, to made a preliminary determination as to whether all of the elements of Rule 702 are satisfied by a preponderance of the evidence. *Paoli II,* 35 F.3d at 741.

■ We must first determine if the witness is qualified. In order to determine

**11.** Defendant's other arguments merit only brief discussion, as it contends that Rules 703 and 403 bar admission of these opinions, but provides no basis or support for exclusion on those grounds. *See United States v. Tomblin,* 46 F.3d 1369, 1376 n. 13 (5th Cir.1995).

First, we note that defendant argues that Rule 703 requires the exclusion of Dr. Goodman and Benowitz's testimony. However, we fail to see how that rule would require us to bar the testimony proffered in this case. Moreover, defendant states that Rule 403 requires exclusion of the witnesses' testimony. However, we find that the rule does not bar the admission of this evidence. "[I]n order for a district court to exclude scientific evidence [under Rule 403] there must be something particularly confusing about the scientific evidence at issue—something other than the complexity of the evidence. *Paoli II,* 35 F.3d at 747. There is nothing particularly confusing or overwhelming about the testimony of these witnesses." *See id.*

whether a proposed expert is qualified to render his or her expert opinion at trial, the district court must engage in a two-step inquiry. Federal Judicial Center, Reference Manual on Scientific Evidence 55 (1994). First, the Court must determine whether the proffered expert has minimal qualifications, either through experience or education, in a field that is relevant to a subject which will assist the trier of fact. *Id.* Second, the Court must compare the expert's area of expertise with the particular opinion the expert seeks to offer to ensure that the opinion to be rendered will be helpful to the jury. *Id.*

■ "The qualifications requirement of Rule 702 has been interpreted liberally." *In re Paoli II,* 35 F.3d at 741. The Third Circuit has explained that "a broad range of knowledge, skills, and training qualify an expert as such.... We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." *Id.* Furthermore, "[t]he rule encompasses not only experts in the strictest sense of the word, such as doctors and engineers, but also witnesses from any large group of skilled individuals who possess expertise by virtue of their experience...." Charles E. Wagner, Federal Rules of Evidence Case Law Commentary 1996–1997 at 514. On the other hand, the inquiry has not been reduced to a mere formality. *See United States v. Velasquez,* 64 F.3d 844, 849 (3d Cir.1995). Thus, the determination of whether an expert is qualified to testify about a particular topic is a fact-specific inquiry.

■ Our second inquiry concerns the reliability of the expert's conclusion. In interpreting the second requirement under Rule 702, the Third Circuit has concluded that " 'an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.' " *Kannankeril v. Terminix Intl., Inc.,* 128 F.3d 802, 806 (3d Cir.1997) (citing *Paoli II,* 35 F.3d at 742). In *Daubert,* the Supreme Court outlined the standards and reasoning that a district court must apply in determining whether an expert's scientific opinion is sufficiently reliable to warrant admission.

The Court recognized that the district court must act as a "gatekeeper" with respect to the admissibility of expert witnesses. 509 U.S. at 579; *Paoli II,* 35 F.3d at 748–49. The focus of a *Daubert* analysis "must be solely on the principles and methodology, and not on the conclusions that the experts generate." *Daubert,* 509 U.S. at 595. In other words, the focus is "not what the experts say, but what basis they have for saying it." *Id.* The inquiry into reliability requires the district court to examine whether the expert has "good grounds" for his opinions, such that the expert's opinions are based on the methods and procedures of science rather than on subjective belief or unsupported speculation. *Id.* at 590; *Paoli II,* 35 F.3d at 742. In essence, "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Paoli II,* 35 F.3d at 742.

■ In reaching its conclusion, the district court should examine "all factors relevant to discerning whether particular scientific evidence is reliable." *Id.* In fact, *Daubert* and *Paoli II* suggest several factors that the district court should take into account in making this determination. However, these factors are "neither exhaustive nor applicable in every case." *Kannankeril,* 128 F.3d at 806–07. The district court may make any other inquiry relevant to the task at hand. *See Reiff v. Convergent Tech.,* 957 F.Supp. 573, 577 (D.N.J.1997).

Finally, we must determine whether the experts' testimony will assist the trier of fact. *See Paoli II,* 35 F.3d at 743. As the Third Circuit explained in *Paoli II:*

Admissibility depends in part on "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." ... *Daubert* explains that, "[i]t is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." ... Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of this case. "Rule 702's 'helpfulness' standard requires a valid scientific connection

to the pertinent inquiry as a precondition to admissibility."

*Id.* (quoting *Daubert,* 509 U.S. at 591; *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)).

Defendant argues that the second of the three requirements of Rule 702 is not satisfied by the testimony of Dr. Carl Goodman and Robert Benowitz.[12] Goodman testified on the issue of whether the allegedly defective Flowtron DVT device caused Poust's compartment syndrome. (Findings of Fact ¶ 68.) Benowitz rendered an opinion which discussed both the defective design of the Flowtron DVT and whether the alleged defects caused Poust's injuries. (*See* Pls.' Exhibits to 12G Statement of Facts, Part II, Ex. 10.) Defendant applies the Supreme Court's decision in *Daubert,* and asserts that these witnesses do not utilize sufficient scientific principles and methodology in reaching their conclusions. Accordingly, defendant maintains that their opinions are unreliable and should be excluded.

In addition, defendant argues that the opinion of Dr. Santos as to the cause of Poust's compartment syndrome is inadmissible because he was not named as an expert in this case, and thus cannot offer his ultimate medical conclusion as to causation. From that premise, defendant argues that absent the testimony of each of these witnesses, plaintiff cannot make out a prima facie case under the New Jersey Products Liability Act.

For purposes of clarity, the Court will discuss each witness under a separate heading, and further assess each requirement as to each witness individually.

### i. *Robert Benowitz*

#### a. *Qualification*

▮ Robert Benowitz holds a Bachelor of Science degree in engineering from Lehigh University, and a law degree from Temple University. (Findings of Fact ¶ 41.) His curriculum vitae claims that his areas of expertise include: (1) hospital and health safety and (2) medical devices—use, safety and design. (*Id.* ¶ 43.) Moreover, he has served as a safety consultant for RMS Associates since 1971. (*Id.* ¶ 42.) In this position, he has investigated electro-mechanical equipment incidents, conducted medical safety testing and provided consulting services to healthcare institutions. (*Id.*) We find that Benowitz's education and experience render him qualified to provide an opinion on the subject of the alleged defects in design of the Flowtron DVT.[13] *See Holbrook v. Lykes Bros. S.S. Co.,* 80 F.3d 777, 782 (3d Cir.1996) (holding that trial court erred in excluding treating physician's diagnosis of plaintiff's specific type of cancer; the fact that the treating doctor was not an oncologist or expert in "definitive cancer diagnosis" was not determinative); *Hammond v. International Harvester Co.,* 691 F.2d 646, 653 (3d Cir.1982) (witness who worked selling automotive and mechanical equipment, including agricultural equipment, and who had taught automobile repair and maintenance at high school was qualified to render an expert opinion as to whether a tractor was defectively designed); *see also United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1079 (5th Cir.1996) (witness with engineering degree was qualified to render expert opinion on extent of future flooding on plaintiff's land in an eminent domain action; court recognized that witness was currently a commodities broker and commented that his present career was "fodder for cross examination but hardly constitut[ed] grounds for finding him unqualified to testify").

▮ We reach a different conclusion, however, on the issue of whether Benowitz is qualified to offer his conclusion as to the specific, medical cause of plaintiff's injury. On the last page of his report dated October 3, 1996, Benowitz stated that "[t]he defects in design and lack of appropriate warnings and instructions were directly related to William Poust's injuries sustained on April 6, 1994,

---

12. As noted, defendant does not provide any argument with respect to whether the testimony in question meets the first and third requirements of Rule 702.

13. It is worth noting that defendant all but conceded Benowitz's qualifications in its brief. (Def.'s Br. in Supp. at 6.)

and were caused by the manufacturer, HNE Healthcare, a division of Huntleigh Healthcare." (Findings of Fact ¶ 49.) As is clear from his curriculum vitae, Robert Benowitz is not a medical doctor. (*Id.* ¶ 41.) Moreover, he admits that fact in his deposition. (Certif. of Jason T. Shaffron in Supp. of Def's.Mot. for Summ.J., Ex. P at 134.) He has no experience, education or training which would qualify him to render an opinion as to the medical cause of plaintiff's injuries. Therefore, the Court finds that his testimony at trial must be limited to the issues of the alleged defects in the Flowtron DVT, and any testimony concerning general causation, i.e., whether the Flowtron DVT could malfunction in such a way so as to cause excessive pressure to the compartments of the calves. *See Diaz*, 893 F.Supp. at 374 (distinguishing between general and specific causation).

b. *Reliability* [14]

Defendant argues that Robert Benowitz's opinion is inadmissible pursuant to the Court's ruling in *Daubert* because "there is no way to test Benowitz's hypothesis, no way to subject it to peer review, no indication that the theory has been accepted in the scientific community, and it is not based on any scientific methods, standards or data." (Def.'s Br. in Supp. at 11.) Defendant characterizes Benowitz's allegations as to the various alleged defects with the Flowtron DVT Service Manual as his own "personal problems" with the device, and argues that his testimony is "net opinion." (*Id.* at 11–13.)

In response, plaintiffs argue that defendant inappropriately applies the *Daubert* factors to Benowitz's conclusions. They maintain that those factors should only apply when the expert's conclusions are based upon a "novel scientific theory or methodology," rather than the expert's experience and observations. (Pls.' Br. in Opp'n at 7–8.) In support of their argument, plaintiffs cite *Compton v. Subaru of Am.*, 82 F.3d 1513 (10th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996), but

offer no other additional argument beyond this contention.

■ We first address the initial question of whether *Daubert* applies here. We agree with plaintiffs to the extent that they recognize that the *Daubert* factors are not helpful in determining the reliability of Benowitz's conclusions. However, we also recognize that the Court's inquiry does not end here. *Daubert* still requires us to examine whether the proffered opinion is reliable, i.e. whether there are "good grounds" for Benowitz's conclusions. This aspect of the *Daubert* opinion speaks to our gatekeeping role. *See Carmichael v. Samyang Tire, Inc.*, 131 F.3d 1433, 1436 (11th Cir.1997).

While our research has not revealed any Third Circuit case squarely addressing the application of the *Daubert* decision to expert opinions based upon technical expertise and experience, we read the *Paoli II* and *Kannankeril* opinions to support our conclusion. Moreover, we are persuaded by the Tenth Circuit's analysis in *Compton* where that court stated:

> the application of the *Daubert* factors is unwarranted in cases where the expert testimony is based solely upon experience or training.... In such cases, Rule 702 merely requires the trial court to make a preliminary finding that the proffered expert testimony is both relevant and reliable while taking into account "the inquiry envisioned by Rule 702 is ... a flexible one."

*Compton*, 82 F.3d at 1519 (quoting *Daubert*, 509 U.S. at 595); *see also Carmichael*, 131 F.3d at 1435–37 (expert's testimony, which was based upon his experience in analyzing failed tires was not subject to *Daubert* analysis); *United States v. Sinclair*, 74 F.3d 753, 757 (7th Cir.1996) ("Daubert does not create a special analysis for answering questions about the admissibility of all expert testimony."); *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 n. 3 (9th Cir.1994) (*Daubert* only applies to evaluation of methodology underlying scientific testimony).

■ Because our role as "gatekeeper" is clearly implicated here, we will now scruti-

14. As we have just determined that Benowitz is not qualified to render an opinion regarding

medical causation in this case, the Court's inquiry here concerns only his admissible conclusions.

nize the basis for Benowitz's conclusions. We find that Benowitz's extensive background, coupled with his review of the Flowtron DVT, Service Manual, and other documents provided "substance upon which [he] could offer scientific opinions that [meet] the required threshold of reliability." *See Holbrook*, 80 F.3d at 785.

Benowitz authored three expert reports in this case, dated January 4, 1996, October 3, 1996, and April 29, 1997. (*See* Pls.' Rule 12G Stmt., Pt. II, Ex. 10.) In each report, he identified several problems, including, *inter alia*, the following defects: (1) absence of adequate instructions in the Flowtron DVT Service Manual; (2) defects with the alarm on the Flowtron DVT; (3) the absence of any fail-safe mechanism to prevent the exertion of constant pressure in the bladder; and (4) the absence of any way to determine the actual amount of pressure exerted by the machine. (*See id.*: (1) January 4, 1996 Report at 3; (2) October 3, 1996 Report at 3; (3) April 27, 1997 Report at 2.)

In reaching his conclusions, Benowitz reviewed various documents submitted by plaintiff and examined a Flowtron DVT device similar to that used during Poust's surgery. (Findings of Fact ¶ 46.) He also tested the alarm to determine its loudness. Thus, it is clear that he did not render his opinion in a vacuum.

■ Furthermore, Benowitz's background and experience in this area is extensive. He has served as a safety consultant with RMS Associates since 1971. (*Id.* ¶ 42.) In this position, he has investigated equipment malfunctions, tested and analyzed health care equipment and served as a consultant to health care institutions regarding safety issues. As such, his opinion is based upon his years of experience in design safety, which he utilized in his analysis of this particular machine and the Service Manual. Keeping in mind that our inquiry under Rule 702 is a flexible one, *see Daubert*, 509 U.S. at 594, we find that his conclusions regarding the

various defects in the Flowtron DVT meet the minimum standard of reliability under Rule 702.[15] *See, e.g.*, *14.38 Acres of Land*, 80 F.3d at 1079 (finding that expert in expropriation case had sufficient basis upon which to form his expert opinion as to the potential of flooding in the future; opinion was based upon his review of maps, photographs and data, his inspection of the property and his experience as a civil engineer); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (affirming admission of a consulting engineer's testimony that plaintiff was in "breathing zone" of glue flames when his opinion was based on examination of safety literature, warnings by defendant, interviews with plaintiff concerning proximity of her work area to unventilated glue pot and extensive practical experience with fumes and ventilation); *Bunt v. Altec Indus., Inc.*, 962 F.Supp. 313, 318 (N.D.N.Y.1997) ("The origin behind [the engineer's] opinion [as to design defect] is his scientific reasoning based upon years of experience and training in the field of mechanical engineering and design safety. Therefore, his opinion constitutes scientific knowledge which is sufficiently reliable and admissible as expert testimony."); *Jugle v. Volkswagen of Am., Inc.*, 975 F.Supp. 576, 581 (D.Vt.1997) ("Drawing all inferences in favor of [plaintiff], the nonmoving party, we find the testimony of [the experts], based as it is on their respective observations, investigations, testing and expertise, meets the requirements of Rule 702 and is therefore admissible.").

c. *Fit*

There is no real dispute between the parties as to this requirement. We agree, and find that the factual record supports a conclusion that Benowitz's testimony will assist the trier of fact.

ii. *Ray Eric Santos, M.D.*

a. *Rule 701*

■ Defendant points out that Dr. Santos was not named as an expert in the case.

---

15. We nonetheless agree with the statement by the district court in *Jugle v. Volkswagen of Am.*, 975 F.Supp. 576, 581 (D.Vt.1997):

> Of course, [defendant] may still raise the shortcomings of [the witness'] tests and theories at trial. As stated in *Daubert*, " 'Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' "

*Id.* (quoting *Daubert*, 509 U.S. at 596).

While we agree that Dr. Santos is not an expert whose testimony is subject to a Rule 702 inquiry, we note that his testimony falls somewhere between traditional lay opinion as to factual matters which is governed by Rule 701 and expert opinion which is the subject of Rule 702. Thus, we are still required to determine if Dr. Santos' conclusion satisfies the standards for admissibility embodied in the Federal Rules of Evidence. In order to determine how this Court should go about that task, we must turn to the Third Circuit's opinion in *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190 (3d Cir.1995). In that opinion, the Third Circuit discussed the interplay between lay opinion as to technical matters under Rule 701 and expert testimony under Rule 702, and the standard by which the trial judge is to determine admissibility of technical lay opinion.

The *Asplundh* court was faced with the issue of whether a lay witness could testify as to the cause of an accident which killed the decedent, Jeffrey Sackerson. Sackerson was killed while operating an aerial lift manufactured by Asplundh, which was mounted onto a truck chassis and used in tree trimming operations. The underlying wrongful death suit was settled, leaving only Asplundh and its insurer's contribution claims against Benton Harbor Engineering ("Benton Harbor"), the manufacturer of the component part which allegedly malfunctioned. After the district court entered judgment for Asplundh and its insurer, Benton Harbor filed a motion for a new trial, which was denied. On appeal, Benton Harbor argued that it was entitled to a new trial because the district court erred in allowing the fleet maintenance supervisor, Michael Jones, to testify as to the cause of the accident, which he attributed to a defective component part in a device manufactured by Benton. *Asplundh*, 57 F.3d at 1193–94.

After reviewing Rule 701 jurisprudence, the Third Circuit addressed the issue of whether Rule 701 contemplates the admission of lay opinion as to technical matters such as product defect or causation. The court concluded that it does, provided that

such testimony is "derive[d] from a sufficiently qualified source as to be reliable and hence helpful to the jury." *Asplundh*, 57 F.3d at 1201. As for the standard to be applied in making that assessment, the court counseled:

> In determining whether a lay witness has sufficient specialized knowledge or experience to ensure that the lay opinion is rationally derived from the witness's observation and helpful to the jury, the trial court should focus on the substance of the witness's background and its germaneness to the issue at hand.... The court should require the proponent of the testimony to show some connection between the special knowledge or experience of the witness, however, acquired, and the witness's opinion regarding the disputed factual issues in the case.

*Id.*

The court further explained that district courts should engage in a screening process "not very different from the screening that attends the ordinary expert qualification ruling." *Id.* at 1202. Nonetheless, the court was explicit in stating: "while we are careful not to suggest that *Daubert* applies to Rule 701, we believe that its spirit also counsels trial judges to carefully exercise a screening function with respect to Rule 701 opinion testimony when the lay opinion offered closely resembles expert testimony." [16] *Id.*

We recognize that the inquiry under Rule 701 need not be as searching as that performed under a Rule 702 *Daubert* analysis. *Id.* Nonetheless, in this particular case, the Rule 702 analyses performed by the Third Circuit in *Paoli II* and *Kannankeril* are particularly instructive in that those opinions address the reliability of physicians' differential diagnoses, which is the question now posed before this Court. After reviewing the jurisprudence interpreting Rule 702's requirements, it is clear to the Court that Dr. Santos' conclusions as to the cause of Poust's compartment syndrome are reliable and admissible even under that heightened inquiry.

---

**16.** Ultimately, the *Asplundh* court determined that the witness's testimony "failed to satisfy the standard" articulated therein. *Asplundh*, 57 F.3d at 1204.

### b. Analysis of Dr. Santos' Opinion

Dr. Santos diagnosed Poust's compartment syndrome and determined that it was caused by "excessive pressure from the Flowtron DVT." (Findings of Fact; Tr. 1 at 93.) This is the testimony to which defendant's object.

Santos' expertise and personal experience both indicate that his testimony is reliable and would be helpful to the jury. *See Asplundh*, 57 F.3d at 1201. Santos testified that he is familiar with the causes of compartment syndrome, and the type of pneumatic compression devices at issue. He has reviewed the pertinent literature on the subject, and has performed several surgeries where such devices were used. More importantly, he was the attending physician during the fasciotomy and two irrigation and debridement procedures, and he compared the pneumatic compression cuffs from a Flowtron DVT to the dusky muscle in Poust's leg. His testimony as to the cause of Poust's injury is the result of his experience, observation and expertise. Courts have afforded great weight to the testimony of treating physicians, such that his testimony here is akin to that of an expert, although not specifically designated as such. *See Holbrook*, 80 F.3d at 783; *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir.1987) ("The rationale for giving greater weight to a treating physician's opinion is that he is employed to cure and has a greater opportunity to know and observe his patient.").

Moreover, our conclusion is further supported by his use of reliable methodology in reaching his conclusion. Here, Santos utilized the technique of differential diagnosis. (Findings of Fact ¶ 18, 30.) As the Third Circuit noted in *Paoli II*, "differential diagnosis generally is a technique that has widespread acceptance in the medical community." Furthermore, "most of the *Daubert* factors—testability, general acceptance, peer review, and degree of production errors" are only of limited help in assessing whether a differential diagnosis in a particular case is reliable. *Paoli II*, 35 F.3d at 758. However, the fact that the process of differential diagnosis involves a more subjective evaluation of a particular patient's situation does not make it a "less reliable science." *Id.* The court found that "the existence of standards controlling the technique's operation, is slightly more helpful in deciding whether the methodologies of the plaintiffs' doctors are reliable." *Id.*

Thus, the court in *Paoli II* recognized that while the method of differential diagnosis is clearly a reliable methodology in general, that does not answer the question of admissibility. Put another way, it is not enough for the doctor to state that he employed differential diagnosis to reach his ultimate conclusion; instead, the *Paoli II* court requires the district court to delve into the particular witness's method of performing a differential diagnosis to determine if his or her ultimate conclusions are reliable.

The *Paoli II* and *Kannankeril* decisions provide guidance in determining whether a witness's differential diagnosis as to the cause of a plaintiff's injuries is sufficiently reliable to be helpful to the jury. The Third Circuit stated:

> The elements of a differential diagnosis may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests. A doctor does not have to employ all of these techniques in order for the doctor's diagnosis to be reliable.

*Kannankeril*, 128 F.3d at 807; *Paoli II*, 35 F.3d at 742. Furthermore, the *Paoli II* court explained that "at the core of differential diagnosis is a requirement that experts at least consider alternative causes—this almost has to be true of any technique that tries to find a cause of something." *Paoli II*, at 759.

Here, we find that Santos engaged in the standard procedures of differential diagnosis. *See Paoli II*, 35 F.3d at 762. He began his differential diagnosis with a physical examination of the patient. This occurred during the fasciotomy and subsequent irrigation and debridement procedures, where he was the attending physician. (Tr. 1 at 56, 67, 68.) Santos also was aware of the patient's medical history, as he had discussed it with the patient when he initially diagnosed Poust's

back condition. (*Id.* at 31–32.) Moreover, in order to confirm his hypothesis, Dr. Santos measured a cuff from the Flowtron device against the necrotic tissue found in Poust's leg. (Findings of Fact ¶ 28.)

The record also reveals that Dr. Santos performed the hallmark of differential diagnosis in that he identified several possible causes for the compartment syndrome, considered those alternatives, and ruled them out to reach his conclusion with a reasonable degree of medical certainty. During the Rule 104 hearing, defense counsel posed several questions regarding possible alternative causes of Poust's compartment syndrome, and for each alternative, Dr. Santos provided an explanation as to why he eliminated each possibility. (*See Id.* ¶¶ 30–37.) Dr. Santos was questioned concerning the possibility of positioning, external pressure on the plaintiff during surgery, plaintiff's predisposition to compartment syndrome, TEDs or cuffs being too tight or other human error. (*Id.*) During his testimony, counsel for plaintiff went through each of these alternatives individually, and each time, Dr. Santos was able to explain why he thought each alternatives had not caused the plaintiff's illness. (*See id.*) Thus, this testimony differs from that presented by Dr. Gregorio, the plaintiff's expert in *Paoli II* whose testimony was ultimately excluded. *See Paoli II*, 35 F.3d at 763–64 (discussing Dr. DiGregorio's conclusion that exposure to PCB's caused plaintiffs' injuries and stating that he engaged in few of the standard procedures of differential diagnosis, failed to consider possible alternatives and provide an explanation as to why each alternative had not, in his opinion, caused plaintiffs' illnesses). As in *Kannankeril*, "the record in this case is devoid of any alternative diagnosis which [Dr. Santos] ignored or failed to consider." *Kannankeril*, 128 F.3d at 808.

■ Accordingly, Dr. Santos' testimony satisfies the standards set forth in *Paoli II* and *Kannankeril.* We find that his testimony regarding the cause of Poust's injuries is sufficiently reliable to be helpful to the jury.[17]

### iii. Carl Goodman, M.D.

Dr. Carl Goodman rendered an opinion concerning the cause of Poust's compartment syndrome as well the patient's possibilities with respect to rehabilitation and treatment of his condition. On page four of his expert report, Goodman makes the following statement with respect to causation: "The hyperesthesia, dysesthesia and causality plus the paraparesis that this patient has, is the direct result of the compression excessively on the compartments of his leg as caused by the venodyne device." (Shaffron Certif., Ex. O (Report of Dr. Carl Goodman at 4).) Further, he attempts to rule out the TEDs as an alternative cause of the compartment syndrome, stating: "the elastic stockings placed on this patient were not the cause of this compression injury. These stockings cannot build up enough pressure to cause such a problem when properly fitted to the patient." (*Id.*) Defendant challenges these conclusions, and plaintiff maintains that Dr. Goodman's conclusions satisfy the three requirements of Rule 702.

#### a. Qualification

The parties do not dispute that Goodman is qualified, and the Court agrees. *See Paoli II*, 35 F.3d at 741.

#### b. Reliability

■ Defendant attacks the reliability of Goodman's opinion and methodology, arguing that he has not presented "good grounds" for his conclusions. (Def.'s Br. in Supp. of

17. We note that Dr. Santos recognized that positioning of the patient, ill-fitting TEDs or cuffs could have, in theory, caused a compartment syndrome such as the one found in plaintiff. (*See, e.g.*, Tr. 1 at 78, 79, 85.) However, Dr. Santos' recognition of a "theoretical possibility" does not, in our opinion, make his conclusion unreliable. Indeed, Dr. Santos recognized those possibilities and discounted each of them based upon his experience, the nature of Poust's injury, and general procedures at Navy Medical. He concluded with reasonable medical certainty that excessive pressure from the Flowtron DVT was the *most likely cause* of the compartment syndrome manifested in Poust. At this stage, we find that he has good grounds for this conclusion, and that any perceived weakness in his analysis goes to the weight rather than the admissibility of his testimony. *See Kannankeril*, 128 F.3d at 808.

Summ.J. at 10.) While the admissibility of Dr. Goodman's testimony is a closer call, we disagree with defendant's contention.

Unlike Dr. Santos, Dr. Goodman was not Poust's treating physician. While the parties dispute the purpose for which Poust obtained Dr. Goodman's services, it is clear that his primary focus was to be on plaintiff's condition and ability to be rehabilitated following the incident. (Finding of Fact ¶ 50.) This explains the fact that in his expert report, he only spends one paragraph at the end discussing the cause of Poust's compartment syndrome.

However, that fact does not render Dr. Goodman's opinion inadmissible pursuant to Rule 702. Dr. Goodman applied the methodology of differential diagnosis to reach his conclusion that the injury was caused by excessive pressure from the Flowtron DVT device. (Finding of Fact ¶ 59.) He states that he relied, in part, on the conclusions reached by Poust's treating physicians, Drs. Santos and Chitwood. (See Tr. 2 at 78–79.) He also states that in reaching his conclusion, he took a medical history of the patient, reviewed the hospital records, and ruled out the possible alternative causes of the injury that came to mind. (Id. at 19, 41, 57.)

We find Goodman's opinion as to medical causation admissible in large part due to his reliance on Dr. Santos' differential diagnosis. Dr. Santos, as the treating physician, considered and ruled out every possible cause of Poust's compartment syndrome. Moreover, Dr. Santos has first-hand knowledge of the incident, as he was present both during the initial surgery on plaintiff's back, and the subsequent procedures to alleviate the pressure in Poust's calves. Thus, we find it particularly compelling that Dr. Goodman relied on Dr. Santos' differential diagnosis in reaching his own conclusions concerning causation. Under these circumstances, we find that Dr. Goodman has "good grounds" for the conclusions he reached concerning causation. *Kannankeril*, 128 F.3d at 807; *see also Paoli II*, 35 F.3d at 760 (recognizing that expert opinion may be reliable with less then full information, provided that doctor offered good explanation as to why his or her conclusion remained reliable).

■ We also find that Goodman employed sufficient techniques of differential diagnosis so as to render his opinion reliable and admissible. We recognize that Dr. Goodman did not discuss and rule out every single potential alternative cause in reaching his conclusion. However, the test is not whether plaintiffs' "expert might have done a better job." *Kannankeril*, 128 F.3d at 809. Moreover, requiring a physician to consider and eliminate every single potential cause of a particular condition is practically asking for the impossible. *See Paoli II*, 35 F.3d at 761. While alternative explanations for Poust's compartment syndrome may exist separately, Dr. Goodman concluded that the Flowtron device was the most likely cause of the compartment syndrome. The record demonstrates that when questioned, Goodman considered several alternative possibilities, but still concluded that the malfunction of the Flowtron DVT was the cause of the compartment syndrome. (See, e.g., Tr. 2 at 60–61, 75, 79–85.) We find that any flaws in Dr. Goodman's methodology may be explored at trial, and that the trier of fact may properly consider those deficiencies in determining the weight to be accorded to his ultimate conclusions. *Kannankeril*, 128 F.3d at 809. We find however, that for purposes of this motion, Dr. Goodman's testimony is admissible.

### c. *Fit*

Neither party contends that Dr. Goodman's testimony fails to meet this requirement. We agree.

### 2. *Conclusion*

Based upon the foregoing, we have concluded that plaintiffs have provided admissible expert testimony concerning the issues of product defect and causation. Because defendant's summary judgment motion is premised upon the absence of credible, admissible expert testimony as to these issues, defendant's summary judgment motion must be denied.

### B. *Choice of Law*

■ Plaintiffs request that this Court find that the calculation of damages in this

action will be made pursuant to the law of Pennsylvania rather than the law of New Jersey. New Jersey requires that the calculation of future lost earnings be based on "probable net earnings, take home pay, the amount left after taxes are deducted." Model Jury Charge—Civil, 4th ed., Ch. 6.11D(2). New Jersey also requires that future damages be reduced to present value. *Id.* In contrast, Pennsylvania requires neither. *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027, 1038 (1980); *Rivera v. Philadelphia Theological Seminary of St. Charles Borromeo, Inc.,* 510 Pa. 1, 507 A.2d 1, 12 (1986), *appeal after remand,* 398 Pa.Super. 264, 580 A.2d 1341 (1990), *appeal denied,* 527 Pa. 673, 594 A.2d 659 (1991).

■ When jurisdiction is based upon diversity of citizenship, it is well settled that a federal district court must apply the choice-of-law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New Jersey courts follow the flexible governmental interest approach to choice of laws questions, *Mellk v. Sarahson,* 49 N.J. 226, 229 A.2d 625 (1967), and will apply the law of the jurisdiction having the most significant connection to the transaction involved in the suit. *Henry v. Richardson–Merrell, Inc.,* 508 F.2d 28, 32 (3d Cir.1975); *Baron & Co., Inc. v. Bank of New Jersey,* 504 F.Supp. 1199, 1204 (D.N.J. 1981).

■ The governmental interest approach analyzes the conflicting laws of each jurisdiction, the policies underlying those laws, and the factual context between the parties and each interested jurisdiction. *Henry,* 508 F.2d at 32–33. The analysis requires the measuring of the weight of a state's contact with the parties, not a mere counting of contacts. *Cannon v. Hilton Hotels Corp.,* 664 F.Supp. 199, 200 (E.D.Pa. 1987). Occasionally, the examination of several states' laws reveal that the apparent conflict among the various laws is false. This is because the application of one state's laws would further its policy, while the application of the law of the alternative state would not further its underlying policy. *Colley v. Harvey Cedars Marina,* 422 F.Supp. 953, 955 (D.N.J.1976). In such cases, the latter state

is not an interested jurisdiction; therefore, its law will not be applied. *Id.*

■ The first step in our analysis is to determine whether a conflict exists between Pennsylvania and New Jersey. It is well-settled under New Jersey law that the determination as to whether the states' law conflict is to be made on an issue-by-issue basis. *Amoroso v. Burdette Tomlin Mem. Hosp.,* 901 F.Supp. 900, 903 (D.N.J.1995); *Pollock v. Barrickman,* 610 F.Supp. 878, 879 (D.N.J. 1985); *Veazey v. Doremus,* 103 N.J. 244, 510 A.2d 1187 (1986); *O'Connor v. Busch Gardens,* 255 N.J.Super. 545, 605 A.2d 773 (App. Div.1992). Thus, we reject defendant's contention that "the law of damages to be applied follows the choice of law [determination] governing the substantive legal issues." (Def.'s Br. in Opp'n at 4.) In the past, where our court has been faced with a conflict on the law of damages between two states, we have applied the governmental interest approach to determine if the damages question should be governed by the applicable substantive law, or the law of another jurisdiction. *See, e.g., Pollock,* 610 F.Supp. at 879. Here, the laws are conflicting on the specific issue of the calculation of damages.

Next, we must determine whether, as to that issue, there exists a true conflict of laws. In order to make this determination, we must examine the policies underlying Pennsylvania's rule concerning the calculation of damage amounts. It is clear to the Court that Pennsylvania has an interest in ensuring that its domiciliaries are fully compensated for injuries sustained as the result of a defendant's tortious conduct. *See In re Air Crash Disaster,* 575 F.Supp. 521, 526 (E.D.Pa.1983); *see also Girard Trust Corn Exchange v. Philadelphia Transp. Co.,* 410 Pa. 530, 190 A.2d 293, 297 (1963). This "compensation interest" is implicated here, as plaintiffs are Pennsylvania residents who claim injuries based upon the actions of defendant, a corporation whose principal place of business is in New Jersey. (Am.Compl. ¶¶ 2, 3.)

■ Conversely, it appears that New Jersey's damage calculation is based upon the principle that damages in personal injury actions "should reflect as closely as possible,

the plaintiff's actual loss." *Ruff v. Weintraub*, 105 N.J. 233, 239–40, 519 A.2d 1384 (1987). The goal in setting damages "is to compensate the plaintiff fairly and accurately for his losses." *Bussell v. DeWalt Prods. Corp.*, 105 N.J. 223, 226, 519 A.2d 1379, 1381 (1987). Thus, the policy underlying the rule is rooted in "economic fairness" such that a plaintiff will not get a windfall as a result of the defendant's tortious conduct. *Id.*, 519 A.2d at 1381. The facts presented here clearly implicate the policy underlying New Jersey's damage calculation rule. Defendant is a New Jersey domiciliary who may be subject to a damage award for the defective design of it product. Thus, New Jersey's interest in producing "an accurate award" is a "significant interest" that we must consider.

It is apparent that we are faced with a "true conflict" and a "true dilemma." *See Pollock*, 610 F.Supp. at 879. Thus, we must next examine the contacts between the parties and each state's contacts to the litigation. *Amoroso*, 901 F.Supp. at 903. "It is the qualitative, not the quantitative, nature of a state's contacts [that] ultimately determines whether its law should apply." *Id.* In general, courts begin by looking to the place of the injury. *Id.* However, the place of the injury is of little help in our determination, as the surgery took place in Bethedsa, Maryland.[18] Thus, we will examine, in the present context, the applicable contacts that each state has to the litigation. Here, defendant has no contacts whatsoever to the state of Pennsylvania. It appears that the only fact linking Pennsylvania to this lawsuit is that it is the domicile of plaintiffs. Conversely, defendant is domiciled in the state of New Jersey, and plaintiffs chose to bring this lawsuit in this forum. We think that under these facts, the state with the "most significant relationship" to the litigation is New Jersey. Moreover, we find that the New Jersey policy in promoting "fairness" and an accurate verdict, is of paramount importance.

Thus, after considering the relevant factors, we find that New Jersey law should govern.

An Order accompanies this Opinion.

### ORDER

For the reasons expressed in the accompanying Memorandum Opinion,

IT IS therefore on this 30th day of March, 1998, **ORDERED** that defendant, Huntleigh Healthcare's motion for summary judgment be and hereby is **DENIED**; and

**IT IS FURTHER ORDERED** that plaintiffs William and Kimberly Poust's motion in limine for an Order applying Pennsylvania law to the issue of the calculation of damages be and hereby is **DENIED**. The law of the state of New Jersey will govern any computation of damages at trial.

---

18. At oral argument, the parties conceded that the real dispute was between the application of the laws of New Jersey or Pennsylvania. Thus, we find that Maryland has no interest in applying its damages calculation to the instant matter.